UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - :
                                :
                                :
CELEBRITY CRUISES INC., and     :     96 Civ. 3135 (JCF)
FANTASIA CRUISING INC.,         :
                                :
          Plaintiffs,           :       MEMORANDUM
                                :       AND  ORDER
     - against -                :
                                :
ESSEF CORP., PAC-FAB, INC.,     :
and STRUCTURAL EUROPE N.V.       :
(f/n/a SFC),                    :
                                :
          Defendants.           :
- - - - - - - - - - - - - - - - :

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Celebrity Cruises Inc. and Fantasia Cruising Inc. (collectively, "Celebrity"), initiated this action seeking compensation and indemnification from Essef Corporation, Pac-Fab, Inc., and Structural Europe, N.V. (collectively, "Essef") for damages arising from an outbreak of Legionnaires' Disease on Celebrity's cruise ship, the Horizon. Discovery is complete, and each party has now moved pursuant to Rule 702 of the Federal Rules of Evidence and the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to exclude the testimony of the other side's expert witnesses. For the reasons that follow, each motion is granted in part and denied in part.

Background

This case is related to actions brought by passengers on the Horizon who fell ill with Legionnaires' Disease. See Silivanch

1

<u>v. Celebrity Cruises, Inc.</u>, 333 F.3d 355 (2d Cir. 2003).  The passengers sued both Celebrity, as owner and operator of the vessel, and Essef, as the designer, manufacturer, and supplier of the water filter in the whirlpool spa where the disease originated. <u>Id.</u> at 358-59.

The parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), and they agreed to resolve all liability issues in a single bellwether trial.  <u>Silivanch</u>, 333 F.3d at 359.  At the conclusion of that trial, the jury found both Celebrity and Essef liable to the passengers and apportioned fault seventy percent to Essef and thirty percent to Celebrity. <u>Silivanch v. Celebrity Cruises, Inc.</u>, 171 F. Supp. 2d 241, 250 (S.D.N.Y. 2001).  The jury also found Essef liable to Celebrity for negligence, failure to warn, strict products liability, breach of express and implied warranties, negligent misrepresentation, and fraud.  <u>Id.</u>  The damage claims of the individual passengers were then adjudicated, and Celebrity's damage claims were reserved for subsequent determination in this action.

Celebrity has divided its claimed damages into four categories.  Category I consists of claims for indemnification for attorneys' fees, costs, and amounts paid to the passenger plaintiffs. (Amended and Supplemental Complaint ("Am. Compl."), ¶

23).[1]   Category II includes other out-of-pocket losses such as refunds made to passengers, losses from cancelled reservations, and the cost of the remedial actions taken to cleanse the water system aboard the Horizon.   (Am. Compl., ¶ 24).[2]   Category III

---

[1] The relevant paragraph of the Amended and Supplemental Complaint demands:

Category I: Indemnity for:

a. Attorneys' fees and costs;

b. Disbursements arising out of the preceding litigation, including, but not limited to, expert witness fees, consultant fees and court reporter fees, whether paid directly by plaintiffs or as disbursements to counsel;

c. Amounts paid to Passenger Plaintiffs in settlement of their claims;

d. Amount paid to Passenger Plaintiffs by reason of judgments; and

e. Amounts paid in settlement of claims resulting from the circumstances described in Paragraphs 1-44 of Plaintiffs' Amended Complaint dated July 14, 1999, other than those described in Paragraph 23(c) and (d) above.

(Am. Compl., ¶ 23).

[2] The full demand is as follows:

Category II: Damages for other out-of-pocket losses including, but not limited to:

a. All amounts paid in compensation or reimbursement to passengers booked on the July 16 and July 23, 1994 cruises, including refunds, returns of payment, food, transportation and hotel expenses;

b. All amounts lost from cancellations of reservations on the July 23, 1994 cruise;

c. All amounts paid to victual, house, and transport

HORIZON crew members due to the cancellation of the July 16 and July 23, 1994 cruises;

d. Amounts for services provided to but unpaid for by passengers on the July 16 cruise;

e. Expenses paid to consultants including scientific, medical, legal, and crisis management consultants;

f. Amounts spent to test, hyperchlorinate and clean the HORIZON, including extra port charges;

g. Increases in insurance premiums;

h. Increases in loan interest costs and loan payments;

i. Unrecoverable increased operating expenses, including but not limited to:

- Crew wages, bonuses, tips & expenses

- Concessions

- Port charges and taxes

- Bunkers & lubricants

- Entertainment

- Additional advertising

- Incident claims

- Agent bonuses

- Cruise expenses

- Protected commissions

- Stores

- Sundry expenses;

j. The extra costs of unplanned drydocking of the HORIZON in July, 1994;

damages comprise lost profits for the period from the Legionnaires' incident until Celebrity was purchased by Royal Caribbean Cruise Lines in 1997.  (Am. Compl., ¶ 25).[3]  Finally, Category IV damages encompass Celebrity's loss of business enterprise value.  (Am.

---

k. All losses incurred in endeavoring to mitigate damages; and

l. All other out-of-pocket expenses incurred by Celebrity due to the circumstances described in Paragraphs 1-44 of Plaintiffs' Amended Complaint dated July 14, 1999.

(Am. Compl. ¶ 24).

[3] These damages are characterized as:

Category III: Damages for:

a. Celebrity's loss of revenues, profits and business opportunities due to the stigma and diminution in value which attached to the HORIZON and the Celebrity brand name as a result of the circumstances described in Paragraphs 1-44 of Plaintiffs' Amended Complaint dated July 14, 1999, and the fact that the vessel, company and brand came to be identified with the Legionella virus and Legionnaire's disease; and

b. Extra marketing and advertising costs incurred by Celebrity in an effort to mitigate damages by: 1) reassuring potential customers and travel agents that the HORIZON and other Celebrity ships were safe; and 2) combating the stigma and diminution in value which attached to the HORIZON and the Celebrity brand name as a result of the circumstances described in paragraphs 1-44 of Plaintiffs' Amended Complaint dated July 14, 1999, and the fact that the vessel, company and brand came to be identified with the Legionella virus and Legionnaire's disease.

(Am. Compl., ¶ 25).

Compl., ¶ 26).[4]

Celebrity has identified experts who would testify at trial with respect to each of the four categories of damages.  Essef has not moved to preclude those Celebrity experts who are expected to present evidence on Category I and II damages.  It does, however, challenge each of the experts who would testify for Celebrity on Category III and IV damages:  Nelson M. Fellman, James L. Winchester, Pamela M. O'Neill, David B. Lasater, Allen Pfeiffer, and Robert P. Schweihs.[5]  In addition, Essef seeks to exclude the evidence of Bryan H. Browning, who has submitted a declaration in opposition to Essef's motion for summary judgment.  Celebrity, in turn, has moved to preclude the testimony of each of Essef's experts:  Joseph E. Obermeyer, Jeffrey L. Baliban, and Frederick C. Dunbar.

---

[4] This category is described as follows:

Category IV: Damages for loss of business enterprise value of Celebrity and the Celebrity brand name and loss of good will associated with Celebrity and the Celebrity brand name as a result of the circumstances described in Paragraphs 1-44 of Plaintiffs' Amended Complaint dated July 14, 1999, and the fact that the company and brand name came to be identified with the Legionella virus and Legionnaire's disease.

(Am. Compl., ¶ 26).

[5] Essef also moved to exclude the testimony of John Kilpatrick, who opines on Category IV damages, but Celebrity has withdrawn him as a witness.  (Celebrity's Memorandum of Law in Opposition to Defendant's Daubert Motion to Strike the Reports and Testimony of Plaintiffs' Experts ("Celebrity Opp. Memo.") at 1 n.1).

I will outline each witness's expert opinion in connection with the analysis of its admissibility.

Discussion

Pursuant to the Rule 104(a) of the Federal Rules of Evidence, the admissibility of expert testimony is a preliminary question of law for the court to determine. Daubert, 509 U.S. at 592. The proponent of the testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); Berk v. St. Vincent's Hospital and Medical Center, 380 F. Supp. 2d 334, 349 (S.D.N.Y. 2005) (citations omitted); Astra Aktiebolag v. Andrx Pharmaceuticals, Inc., 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002). In Daubert, the Supreme Court explained that the trial judge must perform a "gatekeeping" function to ensure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. As the Court later elaborated, this gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 146-47 (1999).

While Rule 104(a) address the admissibility of evidence generally, the admissibility of expert testimony is specifically governed by Rule 702 of the Federal Rules of Evidence. See Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). That rule

provides:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably
> to the facts of the case.

Fed. R. Evid. 702.   Holding that the adoption of Rule 702
superceded Frye v. United States, 293 F. 1013, 1014 (D.C. Cir.
1923),[6] Daubert rejected the Frye requirement that, in order to be
admissible, a scientific theory had to be generally accepted within
the scientific community.   509 U.S. at 585-89.

    Instead, the Daubert Court identified several factors that
lower courts might consider in determining reliability and
relevance: whether the theory at issue can and has been tested;
whether the theory has been subjected to peer review and
publication; whether there is a known or potential error rate; and,
finally, whether the theory has been generally accepted within the
scientific community.   Id. at 593-94.   The Court emphasized that
the listed factors are by no means "a definitive checklist or test"
to be blindly applied in every case.   Id. at 593.   Rather, they

---

    [6]  The Daubert Court was interpreting an earlier version of
Rule 702, and, in fact, the rule was later amended partly in
response to Daubert.  However, the differences between the current
version and that considered in Daubert are immaterial for present
purposes.

"may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150. The admissibility determination therefore involves a "need for flexibility," Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), as "the gatekeeping inquiry must be tied to the facts of [the] particular case." Kumho Tire, 526 U.S. at 150 (quotation marks and citation omitted).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Indeed, the Advisory Committee notes to the 2000 amendments to Rule 702 state that the rejection of expert testimony is "the exception rather than the rule." See E.E.O.C. v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3, AFL-CIO, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." Amorgianos, 303 F.3d at 267. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596

(citation omitted).

On the other hand, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." <u>Amorgianos</u>, 303 F.3d at 266; <u>see</u> <u>Ruggiero v. Warner-Lambert Co.</u>, 424 F.3d 249, 253 (2d Cir. 2005). Thus, "'any step that renders the analysis unreliable under the <u>Daubert</u> factors renders the expert's testimony inadmissible.'" <u>Amorgianos</u>, 303 F.3d at 267 (emphasis omitted) (quoting <u>In re Paoli Railroad Yard PCB Litigation</u>, 35 F.3d 717, 745 (3d Cir. 1994)). Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions. <u>Id.</u> (citing <u>Daubert</u>, 509 U.S. at 595). But,

> conclusions and methodology are not entirely distinct from one another. . . . [N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

<u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997); <u>see</u> <u>Ruggiero</u>, 424 F.3d at 253-54; <u>Amorgianos</u>, 303 F.3d at 266.

With these standards in mind, I will turn to the challenged experts.

A. Celebrity's Experts

1. Nelson M. Fellman

Celebrity proffers the testimony of Nelson M. Fellman, Executive Vice President of Enterprise Marketing & Communications, to demonstrate "that Celebrity followed the proper business practices with regard to managing the crisis; that both the cruise industry and Celebrity were harmed because of a decline in business attributable to the outbreak; and that Celebrity was stigmatized." (Celebrity's Memorandum of Law in Opposition to Defendants' Daubert Motion to Strike the Testimony of Plaintiffs' Experts at 47). The first and third issues, however, are not in dispute, and Mr. Fellman has not provided a reliable, useful opinion with respect to the second.

The adequacy of Celebrity's response to the incident could be germane if Essef chose to argue that Celebrity did not take the steps necessary to restore its reputation in the market and therefore failed to mitigate its damages. But Essef has explicitly disavowed any such defense. (Reply Memorandum in Further Support of Defendants' Motion to Preclude the Testimony and Reports of Plaintiffs' Alleged Causation Expert Witnesses: Pamela O'Neill, James Winchester, and Nelson Fellman at 9).

Likewise, there is no serious dispute that Celebrity suffered some stigma as a consequence of the outbreak; the controversy is over the magnitude and duration of that stigma and how it

11

translates into money damages.  Mr. Fellman's analysis provides no insight into the latter issues.  (Report of Nelson M. Fellman ("Fellman Rep."), submitted as Exh. 31 to Declaration of Renee M. Plessner dated Feb. 3, 2006 ("Plessner Decl.")).  Indeed, Mr. Fellman acknowledges that he made no attempt to quantify Celebrity's damages and that he is not qualified to do so.  (Tr. at 366).[7]

The remaining issue -- any decline in business suffered by Celebrity and the cruise industry as a whole attributable to the incident -- is central to the damages phase of this case.  While calculation of Celebrity's losses is the ultimate goal, damage to the cruise industry could be important in determining how to view the profits of comparable companies in order to ascertain the extent to which Celebrity may have deviated from the "norm" as a result of the incident. However, Mr. Fellman's impressionistic report does not contribute to a reliable analysis of these topics. For example, his extensive discussion of an outbreak of Legionnaires' Disease in a Philadelphia hotel in 1976 casts little light on the specific effect that the incident on the Horizon might have had on the profits of Celebrity or of the cruise industry in 1994 and thereafter.  (Fellman Rep. at 5-8).  Certainly, he does not quantify the losses resulting from any stigma related to the

---

[7] "Tr." refers to the transcript of the <u>Daubert</u> hearing conducted April 24-28, 2006.

incident.  Beyond that, Mr. Fellman does not present a compelling argument for causation.  While it certainly seems logical that the Legionnaires' outbreak had a stigmatizing effect at least on Celebrity and perhaps on the cruise industry, it is also possible that other factors overwhelmed the incident as the cause of dwindling profits, and Mr. Fellman does not take account of any such factors.  For example, when asked at deposition about the causes for a decline in business, Mr. Fellman testified as follows:

> Q.  Do you know why less people were cruising on Celebrity in 1995 than in 1994, for example?
>
> A.  My strong suspicion is because of Legionnaires' Disease.
>
> Q.  Okay.  Well, I'm not talking about your suspicion. I'm saying do you have any facts to support the claim that less people were cruising on Celebrity than in 1995 [sic]?
>
> A.  No, no facts.

(Deposition of Nelson M. Fellman ("Fellman Dep."), submitted as Exh. 32 to Plessner Decl., at 163).  Likewise, when questioned about his conclusion that professional travel agents steered their clients away from cruises because of the incident, Mr. Fellman admitted that he had no evidence to support his speculation. (Fellman Dep. at 176-78).

Celebrity is therefore precluded from relying upon Mr. Fellman's report and related testimony.

2. James L. Winchester

James L. Winchester has provided a two-stage damages analysis.

13

In the first stage, he estimated that Celebrity incurred lost earnings of $80.1 million attributable to the outbreak during the period from the date of the occurrence until the second quarter of 1997. (Expert Report of James L. Winchester ("Winchester Rep."), submitted as Exh. 28 to Plessner 2/3/06 Decl., at 3, 19-20). In the second stage, he opined that the enterprise value of Celebrity diminished by $144.9 million as a result of the incident. (Winchester Rep. at 3, 20). Accordingly, Mr. Winchester concludes that Celebrity incurred damages in the total amount of $225 million. (Winchester Rep. at 3, 20).

Essef challenges Mr. Winchester's opinion on the ground that he is not qualified to serve as an expert witness and that his report is incomplete and unreliable. (Memorandum of Law in Support of Defendants' Motion to Preclude the Testimony and Reports of Plaintiffs' Alleged Causation Expert Witnesses: Pamela O'Neill, James Winchester, and Nelson Fellman ("Essef Causation Memo.") at 6-7, 9-25). While Mr. Winchester's credentials qualify him to proffer an expert opinion, the report that he has submitted contains critical analytical gaps that render it unreliable and inadmissible.

### a. Qualifications

Mr. Winchester is currently the President and sole employee of Quantified Value Partners, Inc., an investment advisory firm that he founded in 2003. (Winchester Rep., App. A; Deposition of James

Winchester ("Winchester Dep."), submitted as Exh. 30 to Plessner Decl., at 5; Tr. at 189).   Before that, he was a vice president and then senior vice president of Lazard Frères & Co., where he published numerous reports on the economics of the cruise industry. (Winchester Rep., Apps. A, B).   He holds a bachelor of science degree in Finance and studied International Banking Structures at Saint Gall Graduate School of Economics, Law, Business & Administration in Switzerland.   (Winchester Rep., App. A).

Notwithstanding these credentials, Essef complains that Mr. Winchester is unqualified because he has never submitted an expert report in commercial litigation, has never provided expert testimony at a deposition or in court, is unaware of standards for presentation of expert evidence in federal court, and does not know whether his methodology is generally accepted for use in commercial litigation. (Essef Causation Memo. at 6).   These criticisms miss the point.   The fact that Mr. Winchester is not a professional witness does not disqualify him from providing expert testimony. He must be qualified in his field of expertise, qualification that derives from his education and experience; he need not be familiar with the rules of litigation.   He easily satisfies this standard. He has a substantial background in financial analysis generally and in connection with the cruise industry in particular.

b. Reliability of Lost Profits Analysis

Essef challenges the reliability of Mr. Winchester's report on

15

a number of grounds, the first being that he failed to conduct a discounted cash flow ("DCF") analysis.  Instead, with respect to damages prior to the acquisition of Celebrity in 1997, Mr. Winchester conducted what is essentially a comparable companies study.  In sum, he identified a market proxy, determined what net profits Celebrity should have been expected to attain based on the performance of that proxy, and then calculated damages as the difference between the expected profits and Celebrity's actual profits over the relevant period, discounted to the date of the incident.  (Winchester Rep. at 15-20).

Essef relies primarily on two cases in which courts excluded expert analyses that did not utilize the DCF method: Lippe v. Bairnco Corp., 288 B.R. 678 (S.D.N.Y. 2003), and In re Med Diversified, Inc., 334 B.R. 89 (E.D.N.Y. 2005).  In Lippe, the court stated that "[m]any authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ("DCF") method."  288 B.R. at 689.  The court concluded that "[b]y failing to use the DCF method and relying solely on the comparable companies method, [the challenged expert] did not have the ability to do a 'check' on his determinations."  Id.  In Med Diversified, the court adopted the same reasoning, finding that the "failure to use the DCF method amounts to a material flaw in [the expert's] methodology."  334 B.R. at 99.

As broad as this language appears, however, it would be wrong

16

to conclude that there is a categorical requirement that any valuation analysis must be supported by DCF calculations.  Courts recognize that different methods may be acceptable, depending upon the context.  See Steiner Corp. v. Benninghoff, 5 F. Supp. 2d 1117, 1124 (D. Nev. 1998) ("[T]he three methods . . . most accepted, both in the business valuation literature and the cases [] are (1) discounted cash flow analysis, or 'DCF'; (2) the 'market comparables' or 'guideline companies' approach; and (3) the 'acquisitions' method.").  Any analysis will be only as good as the inputs to the model.  See Peltz v. Hatten, 279 B.R. 710, 737-38 (D. Del. 2002); Shannon P. Pratt, et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies (2000) (hereafter, "Pratt") at 84.  Thus, "[t]he [DCF] method involves projections of future cash flows (which are largely dependent on judgments and assumptions about a company's growth rate) and judgments about liquidity and the cost of capital."  Peltz, 279 B.R. at 738; see also Henry v. Champlain Enterprises, Inc., 334 F. Supp. 2d 252, 258 (N.D.N.Y. 2004), vacated on other grounds, Nos. 05-0606-CV, 05-0700-CV, 05-1013-CV, 2006 WL 1102817 (2d Cir. April 26, 2006); Pratt at 154 ("The discounted economic income method is practical only to the extent that the projections used are reasonable to the decision-maker for whom the valuation is being prepared.  Without supportable projections, the discounted economic income method can convey an aura of precision that is not justified.").  Likewise the

comparable companies method is reliable only to the extent that the companies chosen are truly comparable.  See Henry, 334 F. Supp. 2d at 258; Peltz, 279 B.R. at 738; Pratt at 230-33.

Moreover, the courts in Lippe and Med Diversified expressed preference for the DCF method in circumstances where the objective was to value a single business entity at a fixed point in time. The goal here is different: it is to calculate damages that were incurred over a period of time and are attributable to a specific event.  Consequently, the use of comparable companies has the advantageous feature of "controlling" in a rough way for market factors.  That is, factors that impact the market generally are assumed to affect the target company (Celebrity) and the comparators alike.  Thus, a downturn in Celebrity's profits is not attributed to the incident if the comparators suffer similar losses over the same period.

Finally, even in the cases upon which Essef relies, the failure to perform a DCF analysis was only one of many flaws that led the courts to reject the expert analyses.  In Lippe, the expert made numerous calculation errors, 288 B.R. at 694; he failed to consider relevant variables, id. at 693-94; and he neglected to explain a variety of factors critical to his analysis, including the control premium he added to the valuation, id. at 690-93. Similarly, in Med Diversified, the expert applied an inexplicable discount rate, 334 B.R. at 100; weighted the same factors

differently in separate calculations, id. at 100-01; and chose as comparators companies for which he "never considered the nature or products of the businesses, or the market in which these businesses operated[,]" id. at 100.  The need for conducting a DCF analysis as a check on other methods is not as critical in instances where the initial analysis is more trustworthy.

Here, however, there are flaws that doom Mr. Winchester's analysis independent of his decision not to perform a DCF calculation.  Foremost among these is the failure to justify the purported relation between the performance of the proxies and that which would have been expected for Celebrity.

Mr. Winchester's market proxy consists of combined data of Royal Caribbean Cruises Ltd. ("RCCL" or "Royal Caribbean") and Carnival Corp. ("Carnival").  (Winchester Rep. at 15).  The choice of these companies as comparables is debatable and will be discussed in detail in connection with the analyses of other experts.  In evaluating Mr. Winchester's opinion, however, it can be assumed that the proxy is adequate, because the analysis fails in other respects.

According to Mr. Winchester, Celebrity's profits are driven by capacity, occupancy, and pricing.  (Winchester Rep. at 15). Capacity, measured by available passenger cruise days, is a known quantity for both Celebrity and the RCCL/Carnival proxy. (Winchester Rep. at 16).  Occupancy and pricing are interdependent

since, to some extent, a cruise line can increase occupancy by
lowering its prices.  Accordingly, Mr. Winchester "estimated the
[expected] occupancy for Celebrity during the reference period
based on correlation of Celebrity's occupancy to the market proxy
during the 18 months preceding the Legionnaires' outbreak."
(Winchester Rep. at 16).  In other words, he assumed that
Celebrity's occupancy would vary over time in tandem with the
occupancy rate of the proxy.  (Tr. at 350-51).

The key variable in Mr. Winchester's model is therefore
pricing, which he identifies as "gross per diem," that is, revenue
per passenger cruise day.  (Winchester Rep. at 17-18).  To project
how Celebrity's gross per diems would have changed over time had
their been no Legionnaires' incident, he examined the period from
March 1993 to June 1994:

> [W]e looked at the differential between Celebrity and the
> market proxy and that differential was improving over
> time.  You see, basically, if you look at a year over
> year basis that there is an improvement in Celebrity's
> performance relative to the market.  We looked at the
> rate at which that differential was improving year over
> year and at [June 1994] we froze that improvement . . .
> and then we regressed it to zero over the reference
> period ending in [1997].

(Tr. at 354).  In other words, Celebrity's prices -- its gross per
diems -- were significantly lower than those of the proxy as of
March 1993.  However, Celebrity raised its gross per diems at a
faster rate until March 1994, when they roughly matched those of
the proxy.  Mr. Winchester assumes that Celebrity's improvement in

20

pricing relative to the proxy would have continued, albeit at a diminishing rate, until 1997.  Thus, he projects that of the twelve quarters from September 1994 until June 1997, Celebrity's gross per diem would have been higher than the proxy's in eight quarters and equal in two others.  (Winchester Rep. at 18 (chart), 24, 25).

Mr. Winchester's speculation is not adequately justified.  He argues that

> without the negative effect of the [Legionnaires' Disease] outbreak, Celebrity's gross per diem would have improved to a level comparable to the market proxy in 1995 and tracked or slightly improved relative to the market as the company rolled out its three new ships over 1995, 1996 and 1997 -- each achieving a premium as a new ship and further contributing to Celebrity's overall brand image as a premium cruise product.

(Winchester Rep. at 18).  But if capacity is increasing, prices can be raised while maintaining profitability only if demand is also increasing.  That was true during the period prior to the incident -- the period from which Mr. Winchester derives his projection. "During 1993 and the first half of 1994, demand for berths exceeded capacity, which tended to support price increases and drove Celebrity's decision to increase capacity in the form of new ships."  (Reply Declaration of Jeffrey L. Baliban to Preclude Causation Experts dated March 17, 2006 ("Baliban Reply Decl."), ¶ 7).  However, in 1995 Celebrity's own management observed that "as demand has weakened somewhat, particularly toward year-end 1994 and early 1995, many cruise lines have been offering lower per diems in order to fill their ships."  (Baliban Reply Decl., Exh. 4 at 3).

Mr. Winchester's premise that Celebrity's pricing could have outpaced the market is simply not supported.

Mr. Winchester's lost profits analysis, then, lacks the reliability required for expert evidence under Daubert.

c. Reliability of Lost Enterprise Value Analysis

Mr. Winchester's lost enterprise value analysis relies on a comparison of the purchase of Celebrity by RCCL to two other transactions: the acquisition of Norwegian Cruise Line ("NCL") by Star Cruises and the merger of P&O Princess with Carnival. (Winchester Rep. at 20).  He first calculated the value of the Celebrity transaction on a per berth basis. (Tr. 303-04).  Then he did four separate analyses of the comparable transactions, making different adjustments for the relative size of the transactions and the age of the fleets. (Declaration of James L. Winchester dated Oct. 11, 2005 ("Winchester Decl."), attached as Exh. 29 to Plessner Decl., ¶ 28).  Following that, he calculated the mean of the four results to obtain his estimate of the value of a benchmark transaction unaffected by the Legionnaires' incident. (Tr. at 313-16; Winchester Decl., ¶ 35).  Finally, he calculated the difference on a per berth basis between the Celebrity transaction and the benchmark, multiplied this by the number of berths in the Celebrity deal, and discounted the result back to the date of the incident to derive the final damage figure. (Winchester Rep. at 20; Winchester Decl., ¶¶ 36-37).

Unfortunately, Mr. Winchester made no substantial effort to justify the choice of the two transactions as reasonably comparable to the purchase of Celebrity.  The scale of the transactions was different, as Celebrity had 8,000 berths, NCL 12,000, and P&O Princess 30,000.  (Tr. at 335).  The other two transactions were subject to competitive bidding, whereas the sole bidder for Celebrity apart from RCCL made only a last-minute offer.  (Tr. at 331-34).  Finally, the NCL and P&O Princess deals took place approximately two and one-half and five years, respectively, after the Celebrity transaction, and Mr. Winchester did not account for any market changes over the intervening period that might have affected the relative value of the sales.  (Tr. at 307-09).[8]

Mr. Winchester's lost enterprise value analysis is thus unreliable, and his entire opinionis therefore precluded.

### 3. Pamela M. O'Neill

The analysis by Pamela M. O'Neill, a principal of XRoads Solutions Group, is likewise divided into two sections: a calculation of damages for the period from 1994 through 1997 and an estimate of lost enterprise value at the time Celebrity was sold to RCCL.  Ms. O'Neill's opinion hinges on an expected growth rate for

---

[8] In addition, Mr. Winchester did not discount the value of each transaction to a common date (Tr. at 336-37), and he failed to provide adequate justification for the rate that he used to discount his final damage calculation back to the date of the incident.  (Reply Declaration of Frederick C. Dunbar to Preclude Causation Experts dated March 17, 2006, ¶¶ 9-10).

Celebrity's revenue which, in turn, is based in part on the projected revenue growth of a proxy consisting of RCCL and Carnival. (Expert Report of Pamela M. O'Neill ("O'Neill Rep."), submitted as Exh. 12 to Plessner Decl., at 33-34). Thus, Ms. O'Neill notes that as of 1994, RCCL's revenue was anticipated to grow at rates of between 2.5 and 4.9 percent during the period from 1994 to 2000, while Carnival's was expected to grow at rates ranging from 0.6 to 2.1 percent. (O'Neill Rep. at 34). Accordingly, she attributes to Celebrity what she characterizes as a conservative growth rate of 3.0 percent throughout the relevant time. (O'Neill Rep. at 34).

The problem is that the market proxy did not, in fact, display the growth that analysts had anticipated in 1994. Rather, RCCL experienced growth rates of 0.21%, -1.08%, and -1.25% during 1995, 1996, and 1997, respectively. (Plessner Decl., ¶ 26 & Exh. 17 at 18-19). Similarly, Carnival had growth rates of -2.6%, -3.7%, and -1.7% over the same period. (Plessner Decl., ¶ 25 & Exh. 16). When Ms. O'Neill conducted her analysis, she was unaware that this actual performance data was available (Deposition of Pamela M. O'Neill ("O'Neill Dep."), attached as Exh. 13 to Plessner Decl., at 58-60, 74-75), and she later acknowledged that she would have considered such information had she known of it. (O'Neill Dep. at 58-60, 74-75).

Yet, even when she became aware of the disappointing

performance of RCCL and Carnival (Tr. at 431), Ms. O'Neill declined
to incorporate their actual growth rates into her methodology.
(Tr. 429-30). Instead, she insisted, "[E]ssentially what I looked
at was the historical performance of Royal Caribbean, Carnival, and
Celebrity. I looked at what was expected for each of those
companies by investment analysts that track the industry and that
make projections about growth, and I also considered a variety of
qualitative factors as well." (Tr. at 430). While this
exclusively forward-looking methodology may be appropriate for
valuing an enterprise at a single point in time, see Pratt at 42-43
("Value, under any plausible theory of capitalized earning power,
is necessarily forward looking. It is an expression of the
advantage that the owner of the property may expect to secure from
the ownership in the future. The past earnings are therefore
beside the point, save as a possible index of future earnings."
(quotation and emphasis omitted)), it is inadequate to measure
damages attributable to an event occurring after the point in time
when the projections are made. An example will illustrate this.
Assume that three percent was a reasonable projection of the future
growth rate of Celebrity, RCCL, and Carnival immediately prior to
the Legionnaires' incident. Suppose, however, that shortly after
the incident, a cataclysmic event unrelated to the Legionnaires'
incident halted all cruises for a prolonged period. That would be
reflected in zero (or negative) earnings for all three companies.

Yet if Celebrity's actual profits were compared to the profits that had been projected for RCCL and Carnival without considering their actual performance, one would reach the nonsensical conclusion that Celebrity had suffered continuing damage entirely due to the Legionnaires' incident, when in fact it was wholly attributable to an independent event.

Though less dramatically, that is what Ms. O'Neill's analysis does. Celebrity, RCCL, and Carnival all fell short of projections. Ms. O'Neill attributes their negative growth rates to a decline in demand. (Tr. at 433-34). Yet she allocates virtually all of that decline in Celebrity's case to the Legionnaires' incident without making any effort to determine the cause of the decline for the two comparable lines. (Tr. at 436-38). Having utilized those companies in projecting Celebrity's expected growth, it is disingenuous then to ignore their actual performance and how it might cast light on factors other than the Legionnaires' incident that had an impact on Celebrity. Her lost profits analysis therefore lacks the requisite reliability.

This flaw affects the lost enterprise value analysis as well. Ms. O'Neill states, "The logic that I used to quantify what RCCL would have paid [to purchase Celebrity] relied upon the same methodology discussed in calculating Celebrity's lost net income between 1994 and 1997." (O'Neill Rep. at 38). And, she specifically relied on the same three percent growth rate.

(O'Neill Rep. at 38).

Moreover, Ms. O'Neill's lost enterprise value analysis began with budget projections made in 1993, which she compared to later estimates or actual results in 1997. (O'Neill Rep. at 38-39). Yet she failed to demonstrate the reliability of the forecasts, and the record shows that the budgets were often significantly off-target. Indeed, to take 1993 as an example, Celebrity budgeted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $61.9 million for the Horizon and its sister ships, the Zenith and the Meridian, but the actual EBITDA for those three vessels in that year was $55.4 million. Using Ms. O'Neill's methodology, this would indicate damages of over $83 million for that year, even though the Legionnaires' outbreak had not yet occurred. (Expert Report of Frederick C. Dunbar ("Dunbar Rep."), submitted as Exh. 27 to Plessner Decl., at 17-18).

Ms. O'Neill's expert evidence is therefore excluded.

### 4. David B. Lasater

Dr. David B. Lasater, a Senior Managing Director of FTI Consulting, Inc., took a different tack in his lost profits analysis. Rather than basing expected profits on some industry proxy, his basic model projected profits consistent with a five-year plan formulated by Celebrity management in January 1994. (Report of David B. Lasater ("Lasater Rep."), submitted as Exh. 32 to Declaration of Jeffrey C. Crawford dated Feb. 3, 2006 ("Crawford

27

Decl."), at 6-7). By comparing those anticipated profits with profits actually realized by Celebrity over the relevant period, Dr. Lasater concluded that Celebrity lost approximately $101.0 million. (Lasater Rep. at 7 & Exh. 5). He then adjusted his projections in various ways and obtained alternative results. First, he assumed that instead of precisely meeting management's five-year plan, Celebrity's net revenues would have increased or decreased in line with industry-wide demand levels had there been no outbreak. This modification results in cumulative lost profits of $117.8 million. (Lasater Rep. at 7 & Exh. 7). Next, Dr. Lasater altered his analysis by assuming that Celebrity's profits would actually have exceeded management's projection, as he asserts they did for the first six months of 1994. From these assumptions, he calculated lost revenue of $107 in relation to the five-year plan alone and $123.9 million when including adjustments for industry-wide demand. (Lasater Rep. at 7-8 & Exhs. 6, 8). Dr. Lasater then discounted his various lost profits calculations back to July 1994, and found that they ranged from $74.8 million to $89.6 million, with a midpoint of $82.2 million, which he concluded is the best estimate of Celebrity's damages. (Lasater Rep. at 8).

Dr. Lasater's lost profits analysis is flawed in at least one major respect: the projection of profits based on Celebrity's five-year plan is wholly unreliable. "[T]he entrepreneur's 'cheerful prognostications' are not enough." Schonfeld v. Hilliard, 218 F.3d

164, 173 (2d Cir. 2000) (quoting <u>Dobbs Law of Remedies</u> § 3.4).
Indeed, Robert P. Schweihs, another of Celebrity's experts,
explicitly rejected use of the five-year plan to project
anticipated profits after December 31, 1994, because it was
prepared at a point too remote in time and failed to account for a
variety of relevant factors. (Expert Report of Robert P. Schweihs
("Schweihs Rep."), submitted as Exh. 27 to Crawford Decl., at 15).
Mr. Schweihs's skepticism is well-founded. With respect to the
three vessels used in Dr. Lasater's calculations, one failed to
meet its budgeted revenue target for the first quarter of 1994, and
all three failed to do so in the second quarter of that year.
(Declaration of Joseph E. Obermeyer dated March 16, 2006, ¶ 10 &
Exh. 2). Thus, Celebrity hardly exceeded management expectations
prior to the incident. Even if it had, it would be a leap of faith
to assume, based on performance for two quarters, that the
projections would be equally accurate over the subsequent three
years.

Dr. Lasater's method for calculating lost enterprise value is
also unique among Celebrity's experts. In order to value the
company before and after the outbreak, he relied on two actual
transactions involving Celebrity itself: a 1992 joint venture
agreement between Overseas Shipping Group, Inc. ("OSG") and
Archinav Holdings, Ltd. ("Archinav"), which essentially created
Celebrity, and the 1997 acquisition of Celebrity by RCCL. (Lasater

29

Rep. at 8).  The 1992 transaction was valued at $771.2 million, which is equal to a 15.6 times Celebrity's trailing 12-month EBITDA.  Using the same multiple to calculate Celebrity's value in June 1994 -- the date of the incident -- Dr. Lasater arrived at a valuation of $888.1 million.  (Lasater Rep. at 9).  Alternatively, by using multiples derived from Carnival, he obtained a valuation of $768.5 million.  (Lasater Rep. at 9).  Dr. Lasater then adopted the midpoint of these two estimates, $828.3 million, as the value of Celebrity prior to the outbreak.  (Lasater Rep. at 9). Subtracting actual free cash flow for the period from July 1994 to July 1997 and lost free cash flow for the same period, he arrived at an implied enterprise value of $732.6 million.  (Lasater Rep. at 11 & Exh. 18).

To calculate the post-outbreak value of the company, Dr. Lasater began with the price of $1.312 billion paid by RCCL.  He then adjusted that price to account for anticipated synergies between Celebrity and RCCL embedded in the purchase price and for the fact that certain vessels included in the 1992 valuation were not part of the sale to RCCL.  On the basis of these modifications, Dr. Lasater concluded that the adjusted purchase price of Celebrity was $976.4 million.  He then discounted this figure and determined that the present value of the sale as of July 1994 was $621.1 million.  (Lasater Rep. at 10).  The difference between that figure and the implied enterprise value of $732.6 million was

$111.5 million -- Dr. Lasater's best estimate of the lost enterprise value. (Lasater Rep. at 11-12 & Exh. 18).

The overwhelming shortcoming in Dr. Lasater's analysis is his treatment of the synergies expected to be realized through the acquisition of Celebrity by RCCL. Synergies are cost efficiencies and other factors that make an asset more valuable once it has been acquired than it was standing alone. (Tr. at 586). Dr. Lasater began with a pre-transaction analysis prepared for Celebrity's owners by Goldman Sachs, which estimated the value of expected synergies to be between $20 million and $50 million. (Tr. at 587-89; Lasater Exh. 18 at bates no. GS0000484).[9] He then took the midpoint, $35 million, and multiplied it by the transaction multiple of 12 to obtain a total of $420 million in synergies. (Tr. 586-88; Lasater Rep. at 10 & Exh. 15). Dr. Lasater then adjusted the 1997 purchase price by, in part, subtracting this $420 million. (Lasater Rep. at 10 & Exh. 15). Ultimately, he made the appropriate adjustments for the time value of money and subtracted the 1997 adjusted purchase price from what he had determined to be the value of Celebrity at the time of the Legionnaires' incident, obtaining a lost enterprise value damages figure of $111.5 million. (Lasater Rep. at 10-12 & Exh. 18).

Implicit in this methodology is an assumption of how Celebrity

---

[9] An exhibit number following the name of a witness refers to an exhibit introduced at the <u>Daubert</u> hearing.

and RCCL bargained over synergies in setting the price of their deal.  If $420 million is the "actual" value of the synergies, then Dr. Lasater's analysis proceeds as if Celebrity were able to bargain for a total sale price that included their full value. (Dunbar Rep. at 13-14).  Yet, as one of Celebrity's own experts observes, "the management of Celebrity believes that due to the Legionella outbreak, the Company lost its ability to negotiate for the value created by the synergies inherent in the merger." (Schweihs Rep. at 7).  Alternatively, Dr. Lasater's analysis may, in fact, assume that there were substantially greater synergies, but that they were subject to more balanced negotiations.  He has suggested that synergies of $900 million are "arguable" (Tr. at 589-90), which would mean that they would have been divided almost equally in the bargaining in order to be consistent with Mr. Lasater's subtraction of $420 million from the sale price.  The $420 million dollar figure, then, is highly arbitrary, and its impact on the damage calculation is substantial.  If only one-third of that amount were shifted from Celebrity's side of the bargaining table to RCCL's, then, by Dr. Lasater's own analysis, there would be no damages attributable to lost enterprise value.  (Dunbar Rep. at 14).

A methodology so sensitive to one highly subjective variable lacks the necessary reliability.  Dr. Lasater's evidence is therefore precluded.

### 5. Allen Pfeiffer

Allen Pfeiffer, Managing Director of Standard & Poor's Corporate Value Consulting, performed a lost profits analysis which, like Dr. Lasater's, relied primarily on Celebrity's five-year plan as the basis for projecting the financial results that the company would have had in the absence of the Legionnaires' outbreak. After making a series of adjustments, Mr. Pfeiffer calculated that Celebrity suffered total lost profits of approximately $92 million. (Report of Allen Pfeiffer ("Pfeiffer Rep."), submitted as Exh. 18 to Crawford Decl., at 41-43). He then deducted from that amount about $11 million attributable to direct lost revenue, out-of-pocket costs, and "brand repair" expenses -- items included in Category I and Category II damages -- and concluded that Celebrity had lost profits due to discounted pricing of $81 million.[10] (Pfeiffer Rep. at 43).

To be sure, Mr. Pfeiffer also calculated a lower bound for lost profits based not on the five-year projections but on a more conservative methodology that "assumed that Celebrity's net revenue growth would have nearly matched that of Royal Caribbean." (Pfeiffer Rep. at 44). After backing out Category I and II damages, he determined this lower bound to be $58 million. (Pfeiffer Rep. at 44-45).

---

[10] Mr. Pfeiffer ultimately concluded that lost profits were approximately $57 million after discounting to July 1994. (Pfeiffer Rep. at 56-57).

This analysis suffers from the same fatal flaw as Dr. Lasater's methodology: reliance on projections that were not borne out in reality. This defect drives the entire calculation and is not repaired by identifying a lower bound using a methodology which, standing alone, might be more reliable. Mr. Pfeiffer's lost profits analysis is therefore excluded.

Mr. Pfeiffer's lost enterprise value analysis consisted of six different sets of calculations. The first was a discounted cash flow analysis that resulted in a finding of diminished equity value ranging from $919 million to $2 billion. (Pfeiffer Rep. at 47-49). Next, Mr. Pfeiffer took an average of the return on capital for RCCL and Carnival for a period from prior to the outbreak until July 1997 when Celebrity was purchased and applied that rate of return to Celebrity's initial equity value. On this basis, he derived a loss of equity value of $932 million. (Pfeiffer Rep. at 49). Mr. Pfeiffer then turned to four analyses yielding more conservative results. (Pfeiffer Rep. at 50-51). In the first, he adopted the projections prepared for Celebrity by The Blackstone Group L.P. in 1995, and concluded that Celebrity suffered diminished equity value ranging from $325 million to $475 million. (Pfeiffer Rep. at 51-52). Next, he calculated transaction multiples derived from the purchase of Celebrity by Royal Caribbean and applied them to Celebrity's hypothetical financial results. This resulted in a finding of diminished enterprise value of $344

million.  (Pfeiffer Rep. at 52-53).  Third, Mr. Pfeiffer averaged valuation multiples for RCCL and Carnival based on their 1996 results and applied them to Celebrity's hypothetical results for the same year.  This analysis yielded a lost enterprise value of $355 million.  (Pfeiffer Rep. at 53-54).  Finally, he took the initial investment in Celebrity of $452 million in 1992 and grew it at what he posited to be a reasonable rate of return of 13.1%, and concluded that the sale price for Celebrity was $272 million less than what should have been expected.  (Pfeiffer Rep. at 54).  In the final analysis, Mr. Pfeiffer abandoned the two initial calculations, averaged the results of the four more "conservative" approaches, discounted the result back to July 1994, and concluded that the best estimate of Celebrity's lost enterprise value was $252 million.  (Pfeiffer Rep. at 56-57).

For purposes of evaluating reliability, Mr. Pfeiffer's first two methodologies may be ignored, since he ultimately did not rely on them.  The first three of the "conservative" analyses were based on wholly unjustified projections.  The "Blackstone Group scenario is nearly identical to the 1994 January Five-Year Plan" (Pfeiffer Rep. at 51), which, as discussed above, is not an adequate basis for projecting Celebrity's profits in the absence of the Legionnaires' incident.  The next two analyses relied explicitly on the five-year plan itself.  (Pfeiffer Rep. at 53, 54).  And, finally, Mr. Pfeiffer failed to justify in his final analysis his

choice of a "reasonable" rate of return by, for example, comparing it to rates of return for comparable companies. Since none of the individual components of Mr. Pfeiffer's analysis is reliable, the average is likewise flawed, and his expert opinion will not be admitted.

     6. <u>Robert P. Schweihs</u>

Robert P. Schweihs, Managing Director of Willamette Management Associates, also analyzed both lost profits and lost enterprise value. At the outset, Essef characterizes Mr. Schweihs as a "non-causation" expert, that is, an expert who offered an opinion on the magnitude of Celebrity's losses but did not tie those losses to the outbreak of Legionnaires' Disease. This is not an entirely fair characterization. Mr. Schweihs has acknowledged that he is not a causation expert. (Tr. at 22). In his report, however, he specifically noted that he was engaged "to calculate the economic damages suffered by [Celebrity] <u>attributable</u> to the actions of the Defendants." (Schweihs Rep. at 1 (emphasis added)). Thus, "[l]ost profits are calculated as the lost revenue attributable to the Legionella outbreak incident less the variable costs associated with those revenues." (Schweihs Rep. at 12). Similarly, with respect to lost enterprise value, Mr. Schweihs estimated "the value that a hypothetical buyer would have paid at the Transaction Date had the Legionnaires outbreak never occurred." (Schweihs Rep. at 15). Furthermore, Mr. Schweihs indicated that he controlled for

factors other than the outbreak by using the "yardstick" method. (Tr. at 98-99; Deposition of Robert P. Schweihs ("Schweihs Dep."), submitted as Exh. 20 to Crawford Decl., at 52-56, 111-12).  Indeed, one of Essef's own experts characterizes Mr. Schweihs's analysis as calculating lost profits "but for the incident."  (Report of Joseph E. Obermeyer ("Obermeyer Rep."), submitted as Exh. 21 to Plessner Decl., at 15).  Thus, while not concerning himself with the cause of the outbreak or with the allocation of liability, Mr. Schweihs did offer an opinion about the causal relationship between the incident and the economic damages that he calculated.  (Schweihs Dep. at 113).

Mr. Schweihs's analysis of lost profits is based on the difference between expected and actual EBITDA.  For the period from July 1, 1994, until December 31, 1994, he based expected EBITDA on projections prepared by Celebrity management.  (Schweihs Rep. at 14).  For the period from January 1, 1995, through June 30, 1997, however, he declined to use such projections on the grounds that they were created at the beginning of 1994 and failed to consider "certain company-specific and industry factors that affected the operations of Celebrity during the period" and did not accurately anticipate when new vessels would be added to Celebrity's fleet. (Schweihs Rep. at 15).

Instead, for this latter period, Mr. Schweihs used a yardstick approach in which he projected growth based on combined information

for RCCL, Carnival, and American Classic Voyages.  He first calculated the growth rate for the yardstick in terms of EBITDA per available passenger capacity day ("ACD").  Then he took the EBITDA per ACD for Celebrity during the base year of 1994 and adjusted it according to the yardstick growth rate.  Next, he multiplied the resulting figure by Celebrity's actual ACD values for each year, thus obtaining projected EBITDA for Celebrity for each year during the relevant period.  (Schweihs Rep. at 14).

To reach a final damage figure, Mr. Schweihs calculated the difference between the expected EBITDA and Celebrity's actual EBITDA for each year and discounted the stream of profits back to the date of the incident using Celebrity's weighted average cost of capital.  (Schweihs Rep. at 15).  He concluded that Celebrity had suffered lost profits in the amount of approximately $60.25 million.  (Schweihs Rep. at 15).

Essef's primary challenge to the reliability of Mr. Schweihs's analysis focuses on the appropriateness of the yardstick he used. The yardstick served two interrelated purposes in this instance. First, as noted above, it acted as a rough control for factors other than the outbreak of Legionnaires' Disease on the Horizon. For example, an extraneous factor that would depress Celebrity's profits such as a particularly severe hurricane season was controlled for since it would also adversely impact the cruise lines that make up the yardstick.  In that respect, the composite

that Mr. Schweihs has chosen appears appropriate.  The three companies included in the yardstick made up a substantial portion of the North American Cruise market, and their itineraries and market segments overlapped with those of Celebrity.  (Tr. at 85-86, 116-17, 129-31; Declaration of Robert Schweihs dated March 1, 2006 ("Schweihs Decl."), ¶¶ 6, 7).  Also, one of the companies, American Classic Voyages, was close in size to Celebrity and was therefore likely to show similar volatility.  (Tr. at 120; Schweihs Decl., ¶ 7).

The second purpose served by the yardstick was to function as a predictor of Celebrity's performance for the period after the incident.  (Schweihs Rep. at 14).  According to Mr. Schweihs,

> [A]s of July 1st or July 6th of 1994, Celebrity in my view would be expected to perform at least as well as the yardstick and they didn't and the only reason they didn't because they have new ships coming on, they are matching up appropriately with the marketplace, in fact maybe even better positioned in the premium segment, that they should perform at least as well as the industry which is what the yardstick is.

(Schweihs Dep. at 112).  There is, of course, no guarantee that any company's profits will approximate the average for the industry. However, over the six quarters prior to the Legionnaires' outbreak, Celebrity's gross per diems were increasing at a faster rate than those of RCCL and Carnival until they were virtually even with them.  (Winchester Rep. at 18 (chart)).

Dr. Dunbar, one of Essef's experts, accepted the yardstick approach utilized by Mr. Schweihs and acknowledged that it controls

for factors that affect the industry as a whole. (Tr. at 677-78).
Another Essef expert, Jeffrey L. Baliban, likewise agrees that Mr.
Schweihs's methodology was appropriate. (Report of Jeffrey L.
Baliban ("Baliban Rep."), submitted as Exh. 20 to Crawford Decl.,
at 29; Tr. at 706). And, though Mr. Baliban disagrees with the
inclusion of Carnival and American Classic Voyages in the
yardstick, he himself conducted an analysis of Celebrity's damages
using RCCL as a comparable company. (Baliban Rep. at 29-30). The
selection of comparators will seldom approach the "Utopian ideal"
of identifying the perfect clone. See Bennett Box & Pallet Co. v.
United States, Nos. 617-71, 383-72, 413-73, 1978 WL 14875, at *4
(Ct. Cl. Dec. 20, 1978). Accordingly, the criticisms leveled by
Essef go more to the weight afforded to Mr. Schweihs's analysis
than to its admissibility. See Tracinda Corp. v. DaimlerChrysler
AG, 362 F. Supp. 2d 487, 495 (D. Del. 2005). Mr. Schweihs's
opinion with respect to lost profits will therefore be received.

His lost enterprise analysis builds on the same methodology.
According to Mr. Schweihs, "to estimate the value that a
hypothetical buyer would have paid at the Transaction Date had the
Legionnaires outbreak never occurred . . . I have again relied on
the benchmark projections [used to calculate lost profits]."
(Schweihs Rep. at 15). Essef challenges his opinion primarily by
attacking the methodology he used in calculating the weighted
average cost of capital ("WACC").

The analysis in Schweihs Exhibit 6 contains two different measures for Celebrity's weighted average cost of capital ("WACC"), a value of 13.1% as of July 1994 and a value of 11.0% as of July 1997.  While there is nothing incorrect with using different WACC figures as of different dates, the Schweihs Report takes the incorrect and insupportable step of switching the <u>methodology</u> it uses to calculate the WACC between the two dates. . . .  The methodology used to calculate the WACC for 1994 is sensible: because the cost of equity is based on industry data, the capital structure is also based on industry data.    The methodology used to calculate the WACC for 1997 is problematic because it assumes that Celebrity's cost of equity is based on industry data while its capital structure is not.

(Dunbar Rep. at 23).  According to Dr. Dunbar, the consequence is that "the use of the industry cost of equity capital with a Celebrity-specific debt structure produces an underestimate of the WACC."  (Dunbar Rep. at 24).  Furthermore, if the 1997 WACC is recalculated using the 1994 methodology, the lost enterprise value damages decline from $180.6 million to $16.5 million.  (Dunbar Rep. at 24-25).  In response, Mr. Schweihs argues that

No reasonable estimate for market value of Celebrity's equity existed as of the incident date.  Therefore I relied upon indications of the level of equity in the average capital structures of companies in this industry. As of the transaction date I had developed reasonable projections that enabled me to determine an appropriate value of Celebrity's debt and equity.  Based on these indications of value I was able to determine a company specific capital structure to rely upon in calculating the weighted average cost of capital as of the transaction date.

(Schweihs Decl., ¶ 12).  Mr. Schweihs further explains that it was necessary to use two different methods for calculating the WACC in order to reflect the altered capital structure of Celebrity in 1997

as compared to 1994.

> In 1994 I used industry average capital structure because
> the company at that point was about to buy all these new
> ships and implement these one brand new ship every year
> and curve its growth rate which everyone knew was going
> to have an impact on their capital structure.  So I used
> an industry capital structure in '94.

> In '97 on the other hand the company had a
> transaction on that date and on that date the company had
> $800 million in debt because they all had these new ships
> so I used a capital structure in '97 that reflected its
> capital structure on that date.

*     *     *

> In 1994 they are embarking on that growth plan.  In
> 1997 what I've done in my analysis is assume that they've
> completed, essentially completed their complete plan and
> they're now just going to operate more stably as a major
> participator in the industry.

(Tr. at 137-38, 139).  Mr. Schweihs's rationale may be open to

debate, but it is not so aberrant as to preclude admission of his

lost enterprise value analysis.

### 7. Bryan H. Browning

Bryan H. Browning, Senior Vice President of Valuation Research

Corporation, has not been proffered as an expert witness for trial.

Rather, Celebrity has submitted two declarations authored by Mr.

Browning in support of its Daubert motion to exclude the testimony

of Essef's experts.  (Declaration of Bryan H. Browning dated Feb.

1, 2006 ("Browning Decl."); Declaration of Bryan H. Browning dated

March 14, 2006 ("Browning Reply Decl.")).  In short, Mr. Browning

is, as Essef characterizes him, an "attack expert."

The parties have each proceeded on the apparent assumption

42

that Mr. Browning's evidence should itself be subject to a determination of admissibility under the Daubert standard.  That is not correct.  Rule 104(a) of the Federal Rules of Evidence states:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . .  In making its determination, it is not bound by the rules of evidence except those with respect to privilege.

Accordingly, "in determining whether to admit scientific testimony the court may consider materials not admissible in evidence." Ruffin v. Shaw Industries, Inc., 149 F.3d 294, 297 (4th Cir. 1998).

Thus, I need not determine whether Mr. Browning's evidence would be independently admissible under Daubert.  I need only consider whether it is sufficiently reliable to be persuasive in my evaluation of the expert reports that it criticizes.  I will address those issues to the extent necessary in discussing Essef's experts.

B. Essef's Experts

1. Joseph E. Obermeyer

Joseph E. Obermeyer, the principal of Obermeyer & Associates, Inc., a business consulting firm, has provided an expert opinion that criticizes the reports of Celebrity's witnesses and also includes an independent evaluation of Celebrity's damages.  Because the analysis performed by Mr. Obermeyer is unreliable, his opinion is excluded.

The centerpiece of Mr. Obermeyer's report is his evaluation of

43

Celebrity's lost revenues.  He began by identifying a relationship in revenue per passenger cruise day produced by the Horizon and its sister ships, the Zenith and the Meridian, before the Legionnaires' outbreak.  Mr. Obermeyer then observed that revenue declined sharply for the Horizon and the Meridian in the quarter immediately after the outbreak, but not for the Zenith.  By the fourth quarter of 1994, the Meridian's revenues had returned to their pre-incident pattern, and by the third quarter of 1995, the Horizon had as well.  Mr. Obermeyer then compared the actual revenues for these three vessels to that which he projected based on their prior performance and concluded that Celebrity experienced a revenue shortfall of approximately $5.7 million during the third quarter or 1994, $1.6 million in the fourth quarter of that year, and $325,000 in the second quarter of 1995.  (Obermeyer Rep. at 18-19 & Exhs. IA-ID).

The fallacy of this analysis is that it assumes that the Zenith was unaffected by the Legionnaires' incident.  Yet, according to Mr. Obermeyer's own data, revenues produced by the Zenith itself fell between the first quarter of 1994 and the fourth quarter of 1995.  (Obermeyer Rep., Exh. IB).  Likewise, on an annual basis, its EBITDA declined each fiscal year from 1993 through 1996.  (Browning Decl., Exh. 3 at PIIII 0286_0007).  Standing alone, this hardly demonstrates that either Celebrity as a whole or the Zenith in particular suffered damage as a result of the Legionnaires' incident.  However, it certainly indicates that

44

the Zenith cannot be used as a comparator for calculating the damages sustained by Celebrity's other vessels without a more complete analysis than Mr. Obermeyer performed.  For, if the Zenith was adversely affected, then using it as the yardstick potentially underestimates both the magnitude and the duration of damages.

One other aspect of Mr. Obermeyer's report merits attention. He observed that when the outbreak occurred in 1994, Celebrity was owned by OSG and Archinav.  Any loss in enterprise value caused by the incident was not realized until these entities sold their interest to RCCL in 1997.  However, at that time, according to Mr. Obermeyer, any loss was suffered by OSG and Archinav who received less for their shares in Celebrity, and not by Celebrity itself. Consequently, Mr. Obermeyer concluded that any award for lost enterprise value in this case would be a windfall to RCCL as the current owner of Celebrity.  The injured entities, who are not parties to the lawsuit, would receive no benefit at all. (Obermeyer Rep. at 4-5).

This determination is, in effect, an opinion about Celebrity's legal standing, and as such is beyond the province of a financial expert.  Expert testimony that merely states a legal conclusion must be excluded.  See Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 709-10 (2d Cir. 1989) (reversible error to allow forensic engineer to testify that "the railroad was negligent"); F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1256,

1258 (2d Cir. 1987) (excluding testimony of expert witness that contracts were unenforceable because they lacked essential terms); U.S. Information Systems, 313 F. Supp. 2d at 239-41 (inappropriate for expert to provide legal conclusions).  Mr. Obermeyer's opinion about which entity is legally entitled to recover for lost enterprise value is therefore precluded.

In sum, Mr. Obermeyer may present evidence challenging the opinion of Mr. Schweihs, Celebrity's remaining trial expert.  He may not, however, offer an opinion based on his own analysis of Celebrity's lost profits or his view of Celebrity's legal entitlement to lost enterprise value damages.

### 2. Jeffrey L. Baliban

Jeffrey L. Baliban is a Senior Vice President in the Securities and Financial Economics practice of National Economics Research Associates, Inc. ("NERA").  He has submitted an expert report that critiques Celebrity's expert opinions and analyzes Celebrity's lost profits.  (Baliban Rep.).

Mr. Baliban's lost profits opinion relied on the yardstick approach.  He chose RCCL as the comparable company and compared its revenue per passenger cruise day to that of the Horizon, the Zenith, and the Meridian.  Mr. Baliban concluded that any lost profits attributable to the Legionnaires' incident did not extend beyond the third quarter of 1994 and ranged from $4.1 million to $6.3 million.  (Baliban Rep. at 29-30).

46

Potentially, the most vulnerable aspects of Mr. Baliban's analysis are his choice of RCCL as his comparator and his assumption that "Celebrity's per diems should change at rates similar to RCCL." (Baliban Rep. at 29). While this methodology might well be suspect if viewed independently, it is acceptable in the context of a critique of Mr. Schweihs's opinion. Since Mr. Schweihs himself relied on a yardstick that included RCCL as a major component, it is arguably appropriate for Mr. Baliban to adopt RCCL as a comparator. Similarly, since Mr. Schweihs identified an historical relationship between his yardstick and Celebrity, Mr. Baliban could reasonably rely on a parallel relationship for purposes of his analysis.

Celebrity also challenges two additional portions of Mr. Baliban's expert report. First, like Mr. Obermeyer, be rendered an opinion concerning Celebrity's legal entitlement to lost enterprise value damages. (Baliban Rep. at 4-6). For the reasons discussed above, this opinion is excluded. Second, Mr. Baliban incorporated in his report a discussion of the dynamics of the cruise industry, which Celebrity objects to as a mere parroting of information from other sources. However, it is appropriate for an expert to offer background evidence underlying his opinion, see United States v. Mulder, 273 F.3d 91, 102 (2d Cir. 2001); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988), and such evidence need not be independently admissible. Fed. R. Evid. 703. While Celebrity

suggests that the evidence proffered here is unduly prejudicial, it fails to support this assertion.   Accordingly, apart from the inappropriate legal analysis, Mr. Baliban's evidence shall be accepted.

        3. <u>Frederick C. Dunbar</u>

Finally, Dr. Frederick C. Dunbar, a Senior Vice President of NERA, has submitted a report that challenges the lost enterprise value analysis of each of Celebrity's witnesses.   Most of Celebrity's complaints about his evidence go to issues about which expert opinions may differ.   In several respects, however, Celebrity's arguments raise issues of admissibility.

First, Dr. Dunbar expressed his opinion about Celebrity's legal ability to recover for lost enterprise value.   (Dunbar Rep. at 4-6).   As discussed above, this opinion is excluded.

Next, he concluded that "as a general matter, firms having an incident that impairs brand value take steps to restore their brand value.   These investments often result in restoration of the brand within approximately three years -- the time period between the outbreak and when Royal Caribbean bought Celebrity."   (Dunbar Rep. at 3 (footnote omitted)).   Dr. Dunbar is not, however, an expert in brand stigma or restoration, and he only performed an analysis to support this assertion after his expert report had been submitted. Moreover, that "study" did not relate to Celebrity at all.   Such a belated and casual attempt to buttress an opinion outside the

expertise of the witness is not sufficient, and Dr. Dunbar shall not be permitted to testify regarding brand damage.

Third, Celebrity complains that Dr. Dunbar did not perform his own analysis of lost enterprise value, but merely altered one variable in Mr. Schweihs's report.  Indeed, Dr. Dunbar accepted for purposes of argument most of Mr. Schweihs's methodology.  He then corrected what he contends is an error in Mr. Schweihs's calculation of the working average cost of capital and concluded that Celebrity's lost enterprise value damages might range from $9.2 million to $16.5 million, figures that are not statistically distinguishable from zero.  (Dunbar Rep. at 22-27).  But, again, in the context of rebutting Celebrity's expert, there is nothing inappropriate about accepting the majority of that expert's analysis and demonstrating the consequence of changing certain variables.  In this respect, Dr. Dunbar's evidence is admissible.

Conclusion

For the reasons stated above, Essef's motion to preclude Celebrity's experts is granted to the extent that the opinions of Nelson M. Fellman, James L. Winchester, Pamela M. O'Neill, David B. Lasater, and Allen Pfeiffer shall not be admitted; it is denied to the extent that Robert P. Schweihs may testify at trial and that Bryan H. Browning's evidence has been considered in connection with the pending motions.  Celebrity's motion to preclude Essef's experts is granted to the extent that none of them may testify

regarding legal entitlement to lost enterprise value damages, Joseph E. Obermeyer may not present his independent analysis of lost profits, and Frederick C. Dunbar may not testify concerning stigma or brand restoration; otherwise, Celebrity's motion is denied.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         May 12, 2006

Copies mailed this date:

Gregory O'Neill, Esq.
Mark M. Jaffe, Esq.
Elizabeth McCoy, Esq.
Eric M. Underriner, Esq.
Mary T. Reilly, Esq.
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York  10281

Jeffrey C. Crawford, Esq.
Todd A. Bakal, Esq.
Renee M. Plessner, Esq.
Kenneth R. Lange, Esq.
Mound Cotton Wollan & Greengrass
855 Franklin Avenue
Garden City, New York  11530

50