UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - :
                                :
                                :
CELEBRITY CRUISES INC., and     :      96 Civ. 3135 (JCF)
FANTASIA CRUISING INC.,         :
                                :
         Plaintiffs,            :          OPINION
                                :         AND ORDER
    - against -                 :
                                :
ESSEF CORP., PAC-FAB, INC.,     :
and STRUCTURAL EUROPE N.V.      :
(f/n/a SFC),                    :
                                :
         Defendants.            :
- - - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE


> For want of a nail the shoe was lost.
> For want of a shoe the horse was lost.
> For want of a horse the rider was lost.
> For want of a rider the battle was lost.
> For want of a battle the kingdom was lost.
> And all for the want of a horseshoe nail.
>
> — Traditional English Nursery Rhyme

In this case, a jury has awarded damages of more than $190 million, all for the want of a properly functioning water filter. The jury determined that the plaintiffs, Celebrity Cruises Inc. and Fantasia Cruising Inc. (collectively, "Celebrity"), suffered economic injury because a defective filter in a whirlpool spa on a cruise ship failed to prevent the growth of bacteria, which caused a number of passengers on the ship to contract Legionnaires' Disease, which led to adverse publicity for the cruise line, which in turn caused travel agents and passengers to avoid booking on the

line's vessels, which resulted in extraordinary expenses, loss of profits, and a diminution in the value of the company.

The defendants, Essef Corporation, Pac-Fab, Inc., and Structural Europe, N.V. (collectively, "Essef"), were responsible for the design, manufacture, and distribution of the spa filter. Essef now moves for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Rules 50(b) and 59. Essef's central argument is that there is insufficient evidence from which a reasonable jury could conclude that the majority of the losses claimed by Celebrity are traceable to the Legionnaires' Disease incident.

Background[1]

In the summer of 1994, Celebrity was providing pleasure cruises between New York and Bermuda aboard one of its vessels, the Horizon. Following the completion of a cruise that lasted from June 25 to July 2, a number of the passengers fell ill. They were ultimately diagnosed with Legionnaires' Disease, and the United States Centers for Disease Control and Prevention identified the source of the outbreak as the filter in the whirlpool spa aboard

---

[1] Prior opinions in related litigation set forth the general factual background in more detail. See Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355 (2d Cir. 2003); Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169 (S.D.N.Y. 2006); Silivanch v. Celebrity Cruises, Inc., 171 F. Supp. 2d 241 (S.D.N.Y. 2001). Although the trial evidence in this case is summarized in this section, it is discussed more extensively below in connection with the analysis of the parties' legal arguments.

the Horizon.  By this time, a new voyage was underway.  Celebrity terminated that trip when the ship was anchored in Bermuda and arranged to return the passengers to New York so that the vessel could be decontaminated.

Many of the passengers who had fallen ill sued Celebrity and Essef, and Celebrity cross-claimed against Essef for indemnification and damages.  These cases were consolidated, and the parties consented to proceed before me for all purposes including trial pursuant to 28 U.S.C. § 636(c).  They also agreed to a bellwether procedure by which the liability verdict in a single representative case would be binding on all parties.  The jury in the bellwether case would decide whether Celebrity or Essef or both had been responsible for the plaintiffs' injuries.  Further, it would determine each defendant's proportional liability and the amount of punitive damages, if any, to be assessed.  The jury also would determine whether the injuries of the bellwether plaintiffs were proximately caused by Legionnaires' Disease and, if so, would award compensatory damages.  Thereafter, separate proceedings would be conducted on proximate cause and damages with respect to the remaining plaintiffs.

John and Joyce Silivanch were chosen as the bellwether plaintiffs, and trial commenced in May 2000.  Evidence was presented concerning the operation of the filters aboard the Horizon.  Water from the whirlpool spa was supposed to be cleansed

as it passed through sand and gravel in the filter. Impurities would adhere to the medium, and the filtered water would return to the spa through holes in spoke-like appendages known as laterals at the bottom of the filter. The filters themselves were cleaned by backwashing: water was forced up through the laterals and into the sand bed to dislodge waste material. The resulting waste water was then disposed of.

However, the filters did not backwash properly. Water flowed forcefully only in the center core of the sand bed, so that waste material built up at the outer edges. This permitted organic matter called biofilms to develop. The biofilms provided a growth medium for legionella, the bacteria that cause Legionnaires' Disease, and also protected the bacteria from chemical disinfectants. When water containing the bacteria was returned to the spa, it was aerosolized and inhaled by the passengers who subsequently fell ill.

The bellwether jury returned a verdict in favor of the Silivanches, finding both sets of defendants responsible and apportioning liability seventy percent to Essef and thirty percent to Celebrity. Silivanch, 171 F. Supp. 2d at 250. The jury also determined that Essef was liable to Celebrity on the cross-claims for negligence, failure to warn, strict products liability, breach of express and implied warranties, negligent misrepresentation, and fraud. Id. It awarded the Silivanches compensatory damages of

4

$2,660,000 and found Essef liable for punitive damages of $4,200,000 to the passenger plaintiffs and $2,800,000 to Celebrity. Celebrity's damage claims were reserved for later determination in this action.

Essef appealed the verdict in the bellwether case, and Celebrity cross-appealed.  However, Essef's notice of appeal was untimely, and both the appeal and the cross-appeal were therefore dismissed.  <u>Silivanch</u>, 333 F.3d at 355.

Trial of Celebrity's damage claims against Essef was significantly delayed due to the destruction of the files of Celebrity's counsel in the attack on the World Trade Center on September 11, 2001.  After the lost information was reassembled, the parties resumed their preparations for trial.  Each moved to exclude the testimony of the other's expert witnesses pursuant to Rule 702 of the Federal Rules of Evidence and the principles enunciated in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Of the expert witnesses proffered by Celebrity, only Robert P. Schweihs, Managing Director of Willamette Management Associates, had conducted an analysis sufficiently reliable to be admitted in evidence.  <u>Celebrity</u>, 434 F. Supp. 2d at 187-90, 193. Celebrity's claims went to trial in the spring of 2006.

The damages sought by Celebrity fall into three categories. Category I encompasses claims for indemnification of attorneys' fees, costs, and amounts paid to the passenger plaintiffs.

Category II includes other out-of-pocket losses such as refunds to passengers, the expenses of housing and transporting crew members due to the cancellation of cruises, and the costs of decontaminating the Horizon. Category III consists of lost profits from the date of the outbreak until Celebrity was acquired by Royal Caribbean Cruise Lines ("RCCL") in 1997. Finally, Category IV is the lost business value of Celebrity as reflected by the purportedly discounted price paid for it by RCCL.

At the damages trial, Celebrity presented proof with respect to Category II, III, and IV damages. With respect to Category II, or out-of-pocket, damages, Celebrity proffered relatively straightforward accounting evidence. The jury found that Celebrity had incurred Category II losses of $10,435,669 as a result of the Legionnaires' incident, and Essef does not challenge this aspect of the verdict.

Celebrity's lost profits case was more complicated. First, it sought to demonstrate that the company had been stigmatized by the publicity it received as a result of the outbreak. Accordingly, it introduced numerous clippings from the print media as well as examples of broadcast coverage of the incident. Next, several former Celebrity officers and employees testified about the perceived effect of the Legionnaires' outbreak on bookings. They represented that demand had dropped after the incident and that travel agents were wary of booking their clients on Celebrity

vessels.   Finally, Celebrity's expert witness, Mr. Schweihs, presented a model that quantified the company's lost profits attributable to the Legionnaires' incident.  His analysis was based on the difference between the earnings before interest, taxes, depreciation, and amortization ("EBITDA") that Celebrity could reasonably have anticipated had there been no outbreak and that which it actually realized.  For the period from July 1, 1994 to December 31, 1994, he used projections prepared by Celebrity's management as expected EBITDA.  For the period from December 31, 1994 until Celebrity was sold in 1997, he estimated expected EBITDA based on a "yardstick" consisting of three other cruise lines: RCCL, Carnival Corp. ("Carnival"), and American Classic Voyages. Mr. Schweihs then calculated the difference between Celebrity's expected EBITDA and its actual EBITDA for each year.  Finally, he discounted the stream of lost profits back to the date of the incident.   Using this model, he concluded that Celebrity had suffered lost profits of $60.25 million.  (Pl. Exh. 344H).[2]

Mr. Schweihs started with the same methodology in calculating Celebrity's lost enterprise value, or Category IV damages.  Using the yardstick, he projected what the cash flow would have been for Celebrity in perpetuity had the outbreak never occurred.  (Tr. at

---

[2] All exhibits referred to are trial exhibits unless otherwise indicated.

1441-46).[3]  Using a figure of 11.0 percent for the weighted average
cost of capital ("WACC"), he then discounted that revenue stream
back to July 1997 when Celebrity was sold, and determined that its
enterprise value at that time should have been $1.5761 billion.
(Tr. at 1445-47; Pl. Exhs. 344I, 344J).  From that, Mr. Schweihs
subtracted the actual price paid by RCCL for Celebrity, $1.315
billion, and found that the lost enterprise value as of the date of
the sale was $261.1 million.  (Tr. at 1448; Pl Exh. 344J).  He then
further discounted that amount back to the date of the outbreak and
concluded that Celebrity's damages attributable to lost enterprise
value were $180.6 million.  (Tr. at 1449; Pl. Exh. 344J).

The jury awarded a substantial portion, though not all, of the
Category III and Category IV damages that Celebrity sought based on
Mr. Schweihs' testimony.  It concluded that Celebrity was entitled
to $47,648,156 for lost profits up to the date of the sale of the
business and $135 million for lost enterprise value.

Essef challenges the verdict with respect to lost profits on
two principal grounds.  First, it argues that there is no evidence
from which the jury could reasonably conclude that any stigma from
the Legionnaires' outbreak adversely affected Celebrity's profits
after 1995.  (Defendants' Memorandum of Law in Support of Renewed
Motion for Judgment as a Matter of Law or, Alternatively, a New
Trial ("Def. Memo.") at 7-17).  Second, Essef attacks Mr. Schweihs'

---

[3] "Tr." refers to the trial transcript.

methodology.  It contends that his analysis was flawed because the yardstick he created included companies too dissimilar from Celebrity to be valid surrogates and because it failed to account for a variety of confounding factors that could have depressed Celebrity's profits.  (Def. Memo. at 18-25).  Essef also maintains that Mr. Schweihs' use of EBITDA to measure Celebrity's lost profits was improper.  (Def. Memo. at 26-27).

Essef attacks the jury's award for lost enterprise value in three respects.  It contends first that Mr. Schweihs erred in calculating the WACC because he deviated from the formula set forth in a treatise that he co-authored on business valuation.  (Def. Memo. at 27-29).  Next, Essef argues that Mr. Schweihs' analysis is unreliable because it is not validated by comparison to any similar real world transactions.  (Def. Memo. at 29-30).  Essef also maintains that any loss that occurred when Celebrity was sold was suffered only by its former shareholders, not by the company itself, and since those shareholders are not parties to this litigation, no damages for lost enterprise value may be awarded.  (Def. Memo. at 30-31).

Finally, Essef argues that it is entitled to a new trial for two reasons not specifically related to the sufficiency of the evidence.  First, it contends that counsel for Celebrity improperly prejudiced the jury by referring repeatedly in summation to the fact that Essef had been found liable for fraud in the bellwether

trial.   (Def. Memo. at 34-37).   Second, Essef maintains that the jury's verdict is unreliable because it was returned before the court could respond to pending requests from the jury for a readback of Mr. Schweihs' testimony and for identification of an exhibit relied upon by Essef's expert.   (Def. Memo. at 37-38).

<u>Discussion</u>

    A.   <u>Legal Standards</u>

    Under Rule 50, judgment as a matter of law may be granted only if "'(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" <u>Advance Pharmaceutical, Inc. v. United States</u>, 391 F.3d 377, 390 (2d Cir. 2004) (quoting <u>Galdieri-Ambrosini v. National Realty & Development Co.</u>, 136 F.3d 276, 289 (2d Cir. 1998) (alterations in original)); <u>see also</u> <u>Olivier v. Robert L. Yeager Mental Health Center</u>, 398 F.3d 183, 195-96 (2d Cir. 2005).   The court must view the evidence in the light most favorable to the party opposing the motion and must defer to all of the jury's credibility determinations and reasonable inferences.   <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000); <u>Olivier</u>, 398 F.3d at 195; <u>Raniola v. Bratton</u>, 243 F.3d 610, 616 (2d Cir. 2001); <u>Caruolo v. John Crane, Inc.</u>, 226 F.3d 46, 51 (2d Cir.

2000); <u>Galdieri-Ambrosini</u>, 136 F.3d at 289.  The court "may not itself weigh the credibility of witnesses or consider the weight of the evidence."  <u>Meloff v. New York Life Insurance Co.</u>, 240 F.3d 138, 145 (2d Cir. 2001) (quoting <u>Galdieri-Ambrosini</u>, 136 F.3d at 289); <u>see also</u> <u>Reeves</u>, 530 U.S. at 150.  Indeed, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves</u>, 530 U.S. at 151 (citation omitted); <u>see also</u> <u>Mickle v. Morin</u>, 297 F.3d 114, 120 (2d Cir. 2002).

The standard for granting a new trial under Rule 59 is less stringent.  "[U]nlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" <u>United States v. Landau</u>, 155 F.3d 93, 104 (2d Cir. 1998) (quoting <u>Bevenino v. Saydjari</u>, 574 F.2d 676, 684 (2d Cir. 1978)).  Accordingly, "a district court may grant a new trial <u>even</u> where 'there is substantial evidence to support the jury's verdict' if the court is convinced that the verdict was manifestly erroneous." <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 246 (2d Cir. 2003) (quoting <u>Caruolo</u>, 226 F.3d at 54).

Because Essef's motion consists primarily of an attack on the expert evidence presented by Celebrity, it is important to understand the relationship between the standards for granting judgment as a matter of law or a new trial on one hand and the

standards for admitting scientific evidence under Daubert on the
other.

> The "admissibility" and "sufficiency" of scientific
> evidence necessitate different inquiries and involve
> different stakes.  Admissibility entails a threshold
> inquiry over whether a certain piece of evidence ought to
> be admitted at trial.  The Daubert opinion was primarily
> about admissibility.  It focused on district courts' role
> in evaluating the methodology and the applicability of
> contested scientific evidence in admissibility decisions.

In re Joint Eastern & Southern District Asbestos Litigation, 52
F.3d 1124, 1132 (2d Cir. 1995).  Thus, "Daubert did not alter the
standards for judgment as a matter of law in scientific cases[.]"
Id. at 1131.  Rather, it "left the traditional sufficiency standard
intact."  Id. at 1132.

Therefore, in appropriate circumstances, a court can grant
judgment as a matter of law after admitting evidence under Daubert.
As the Supreme Court observed, "in the event the trial court
concludes that the scintilla of evidence presented supporting a
position is insufficient to allow a reasonable juror to conclude
that the position more likely than not is true, the court remains
free to direct a judgment[.]"  Daubert, 509 U.S. at 596.
Furthermore, even where a post-trial challenge to the admissibility
of expert evidence is barred, a trial court remains free to grant
a new trial if it weighs the prevailing party's scientific proof
and finds it wanting.  See Amorgianos v. National Railroad
Passenger Corp., 303 F.3d 256, 263-64 (2d Cir. 2002).

Essef's arguments must now be evaluated in light of this legal

12

framework.

      B. <u>Lost Profits</u>

          1. <u>Judgment as a Matter of Law</u>

Essef concedes that "the record may contain some evidence that Celebrity sustained lost profits in 1995[.]" (Def. Memo. at 11 n.4). Nevertheless, it contends that it is entitled to judgment as a matter of law with respect to any claim of lost profits for 1996 and 1997 and that a new trial is necessary on the issue of the damages sustained by Celebrity in 1994 and some part of 1995. This argument, however, does not recognize the extent to which Celebrity's expert evidence may fill what would otherwise be gaps in its direct proof.

Celebrity provided substantial evidence of the stigma that it suffered as a result of the Legionnaires' outbreak. The incident was covered extensively by the print and broadcast media. (Pl. Exhs. 33, 34). <u>Time Magazine</u> ran a cover story in September 1994 entitled "Revenge of the Killer Microbes" that included a photograph of a cruise ship with the caption: "Legionnaires'; Contamination on the cruise ship Horizon led U.S. officials to consider new safety rules." (Pl. Exh. 36 at 5). Even "The Late Show with David Letterman" referred obliquely to the incident when its "Top Ten Signs You're on a Bad Cruise" included a "Welcome aboard drink made with tetracycline and erythromycin." (Pl. Exh. 320). To be sure, none of the examples of negative press

introduced by Celebrity were published more than three months after the outbreak.  However, Albert Wallack, Celebrity's senior vice president of marketing and passenger services at the time of the incident, testified that travel agents persisted in inquiring whether Celebrity had continuing problems with Legionnaires' Disease up to the time that the company was sold in mid-1997. (Tr. at 177-79).

Celebrity also provided evidence that it lost bookings after the Legionnaires' outbreak and that these losses persisted at least into 1995. (Tr. at 411, 416-24; Pl. Exhs. 292, 293, 294, 295). Celebrity executives testified that travel agents told them that this drop in demand was a result of the incident. (Tr. at 824-27). Essef complains that such testimony should have been excluded as hearsay.  However, testimony concerning the motivation of customers for ceasing to deal with a business is admissible under the state of mind exception to the hearsay rule, Rule 803(3) of the Federal Rules of Evidence, provided that there is otherwise admissible proof that business was lost.  See Callahan v. A.E.V., Inc., 182 F.3d 237, 251-53 (3d Cir. 1999); Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118, 128 (2d Cir. 1980); cf. Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1274-75 (3d Cir. 1995) (holding that district court erred in relying upon anecdotal evidence of customer statements as proof of lost sales).  Here, the independent evidence

of lost bookings provides the necessary predicate for the admissibility of the travel agent statements. And, while Celebrity's witnesses did not identify the agents, this goes to the weight of the evidence, not its admissibility. See Callahan, 182 F.3d at 252 n.11.

Several Celebrity witnesses testified that this drop in demand meant that it was necessary for the company to cut its prices in order to attract passengers. (Tr. at 234, 421, 825). It is particularly important in the cruise industry for ships to sail as full as possible because many of the costs for any given voyage are fixed and because a full ship enhances the enjoyment of the passengers and increases the likelihood that they will book future cruises. (Tr. at 357, 448, 567). Any reduction in fares necessitated by a need to maintain demand after the Legionnaires' incident necessarily caused a loss of profits.

Mr. Schweihs quantified the lost profits claimed by Celebrity. As discussed in the Daubert ruling in this case, his use of a yardstick methodology served two functions: it was a model for predicting what Celebrity's profits would have been had the Legionnaires' incident never occurred, and it provided a mechanism for filtering out factors apart from the outbreak that would have affected the profits of the yardstick companies as well as those of Celebrity. Celebrity, 434 F. Supp. 2d at 188. Although, as will be discussed in more detail below, Essef renews its criticism

of the particular yardstick utilized by Mr. Schweihs, it has offered no compelling reason to reconsider my prior determination that Mr. Schweih's analysis met the <u>Daubert</u> standard and was admissible.[4]

In arguing that judgment as a matter of law is appropriate, Essef relies in large measure on the decision of the Second Circuit in <u>Toltec Fabrics, Inc. v. August Inc.</u>, 29 F.3d 778 (2d Cir. 1994). To the extent relevant here, that case involved a claim by August Incorporated ("August"), a manufacturer of seating products, that it had suffered a loss of future profits as a consequence of its having been sold defective component material by Toltec Fabrics, Inc. ("Toltec"). The jury returned a verdict in favor of August. The court held that "in order to recover for loss of good will, or future profits, the claimant must prove with reasonable certainty, <u>inter</u> <u>alia</u>, (1) the fact of a loss of goodwill, (2) the amount of that loss, and (3) the direct causation of that loss by the defendant's breach." <u>Id.</u> at 781. On the facts of that case, the court found that August had not met its burden: it failed to show

---

[4] Essef also attacks Mr. Schweihs' use of EBITDA as the measure of Celebrity's profitability. It argues that EBITDA is an unreliable parameter because it fails to account for costs during a period in which Celebrity incurred substantial costs unrelated to the Legionnaires' incident. (Def. Memo. at 26). Changes in such costs, such as fuel prices, would have had a disproportionate effect on Celebrity in Mr. Schweihs' model as compared to the larger cruise lines, RCCL and Carnival. While EBITDA may not be the perfect metric, the objections that Essef raises go to the weight of the evidence and do not require that Mr. Schweihs' testimony be disregarded altogether.

that customers would not place orders in the future, that the
companies that declined to place orders did so because of the
defective material purchased from Toltec, or that any specific
quantum of lost profits could be linked to any lost orders.  Id. at
784-85.

Essef contends that the evidence of lost profits in this case
is even less persuasive:

> [H]ere, there was no evidence from any of Celebrity's
> customers, and more important, no evidence from even one
> travel agent as to any alleged fear of cruising on a
> Celebrity ship or any refusal to book clients on a
> Celebrity cruise after the Incident. . . . [H]ere, none
> of Celebrity's witnesses could testify as to causation,
> although [Richard Sasso, senior vice president of sales
> and passenger services at the time of the outbreak and
> later the president of Celebrity] testified that an
> undetermined number of unidentified travel agents lost
> confidence in Celebrity and expressed fear about booking
> cruises.  Neither Sasso nor any other Celebrity witness,
> however, came forward with affirmative proof that, as a
> direct result of the Incident, any particular travel
> agent did not book a Celebrity cruise. . . . Further, any
> evidence offered by Celebrity is speculative as to what
> caused its lost profits.  There is no affirmative
> testimony or documentary evidence that even suggests
> Celebrity lost any profits after 1995 as a result of the
> Incident, much less the amount of the loss. . . .
> Celebrity also did not present any evidence that could
> provide a basis to distinguish lost profits caused by the
> Incident from those caused by other stigmatizing events
> it experienced.

(Def. Memo. at 16-17).  Indeed, Celebrity's officers and employees
failed to link any specific lost bookings to the Legionnaire's
incident.  If theirs were the only proof before the jury, then this
case would be on all fours with Toltec and Essef's motion for
judgment as a matter of law with respect to lost profits after 1995

would have to be granted.

But the trial in this case included a critical element that was absent from _Toltec_: expert testimony that connected a measurable amount of lost profits to the outbreak and accounted for potentially confounding factors.   In _Toltec_, an accountant testified that August's business had lost value and that its sales had diminished, but he could not attribute this to the purchase of defective fabric from Toltec.   _Id._ at 783-84.   By contrast, Mr. Schweihs, using his yardstick methodology, was able to quantify lost profits that, in his opinion, were caused by the Legionnaires' outbreak.   (Tr. at 1410-12; Pl. Exh. 344H).

Thus, there is not such an absence of evidence supporting the jury's award of lost profits that judgment as a matter of law is warranted.

### 2. New Trial

Essef's motion for a new trial is a different matter.   When the evidence is placed in the balance and not simply viewed in the light most favorable to Celebrity, the jury's verdict appears manifestly erroneous.   Not only did Celebrity fail to produce any direct proof of lost bookings after 1995, but Essef proffered evidence that, in fact, Celebrity had fully recovered by that time. And the flaws in Celebrity's indirect proof (Mr. Schweihs' yardstick analysis), while not dire enough to render it inadmissible or to justify judgment as a matter of law, weaken it

to the point that the jury should not have relied on it to compensate for the lack of direct evidence.

As discussed above, Celebrity presented no survey evidence. Nor did it identify a single potential passenger or travel agent who declined to book a cruise because of the Legionnaires' incident.  By contrast, Essef introduced proof that Celebrity itself understood that by 1996, and perhaps earlier, any stigma associated with the outbreak had diminished to the point that it no longer had an impact on Celebrity's profits.  Indeed, the number of passengers booking with Celebrity had rebounded significantly as early as the fourth quarter of 1994.  (Tr. at 722-26). In a 1998 memorandum, a financial analyst for Celebrity, Erin Williams, concluded that while "there was a significant loss of business due to the Legionnaire's incident," that loss was confined to the period immediately following the outbreak:

> Reports from July 15[, 1994] indicate that 4,532 passengers had booked a cruise.  One month later, the number had dropped to 4,103.  <u>However, it appears that overall occupancy for [the fourth quarter] was in line. Our loss therefore was not in the number of passengers, but the number of times the cabins had to be resold.</u>

(Def. Exh. 355) (emphasis added).

Of course, the volume of bookings is not the full story. Celebrity presented testimony that in order to maintain its occupancy rates, it had to discount fares to attract passengers. However, there was also substantial evidence that discounting was rampant in the cruise industry for reasons having nothing to do

with the Legionnaires' incident, and was practiced by all the cruise lines. (Tr. at 855-56, 889-90). Moreover, the pressure to discount increased during this period as the cruise industry generally and Celebrity in particular added capacity by bringing more ships into service. (Tr. at 850-51).

Even using profits, rather than bookings, as the measure, there is strong evidence that the stigma from the Legionnaires' incident dissipated quickly. The Overseas Shipholding Group ("OSG") was the publicly-traded co-owner of Celebrity. The minutes of a meeting of its Finance and Development Committee in September 1994, two months after the outbreak, do not mention the incident at all. (Tr. at 976-77; Def. Exh. 371). Nor do the minutes of the meetings of OSG's board of directors ever suggest that Celebrity's financial performance was adversely affected by the outbreak. (Tr. at 992-96; Def. Exh. 377B-D). OSG's Form 10-K submission to the Securities and Exchange Commission for 1994 did flag the financial effects of the outbreak in that year:

> The 1994 results for [Celebrity] were below those of '93. [Celebrity] incurred a loss in the third quarter, normally its most profitable quarter of the year, due to the 11-day withdrawal of a ship from service in July '94 following isolated cases of Legionnaires' disease among passengers. In addition, the premium segment of the industry experienced greater pricing pressures in the last quarter of the year as the volume of overall bookings declined.

(Tr. at 1002) (quoting Def. Exh. 38B). However, its 10-K forms for the years 1995 and 1996 do not refer to any continuing economic

impact from the incident.  (Tr. at 1004-08).

Furthermore, Celebrity affirmatively downplayed the lasting effects of the Legionnaires' outbreak.  In a November 1994 presentation to a creditor, Kreditanstalt Fur Wiederaufbau, Celebrity stated:

> Overall, the incident of Legionnaires' Disease has had a major impact on the profitability of Celebrity Cruises for the second half of 1994.  <u>But it is our assessment that the brand has not suffered long-term damage.</u>  Many reports in trade and consumer publications have praised us for the way we handled this crisis and have endorsed the quality of our product.  Celebrity Cruises has never been stronger as an organization, and never more ready to take up the challenges of 1995 and beyond.

(Def. Exh. 84 at PIIIK 0091_0019) (emphasis supplied). Similarly, in 1997, John Chandris, Celebrity's chairman, touted the performance of the Horizon in the second and third quarters of 1996 as demonstrating the financial "lift" that that vessel provided to the company.  (Pl. Exh. 182).

Of course, a party may revise its economic analysis with the benefit of hindsight.  Celebrity attempts to do so on the basis of Mr. Schweihs' expert evidence, and if that evidence were sufficiently persuasive, it might overcome the absence of direct proof of ongoing lost profits.  However, it is not compelling enough to achieve that result.

The linchpin of Mr. Schweihs' analysis is his construction of the yardstick.  The yardstick could be validated as a predictor of Celebrity's performance in one of two ways.  First, if the

performance of Celebrity had in the past paralleled that of the yardstick for a significant period, it would be reasonable to infer that it would do so in the future as well.  Alternatively, in the absence of sufficient historical data, Celebrity could demonstrate that the companies that make up the yardstick are similar to Celebrity in material respects and could therefore be expected to mirror its performance.

While there was enough of a record of Celebrity's performance prior to the outbreak for the yardstick analysis to be admissible, see Celebrity, 434 F. Supp. 2d at 188-89, there was not enough to make it convincing.  Celebrity's first full year of operation was 1993, and Richard Sasso acknowledged that in 1994, it was "still a young and growing company."  (Tr. at 876).  Indeed, Mr. Sasso testified that

> a new company . . . waits for its profit.  You don't
> expect a profit the first year or the second or sometimes
> even a third or sometimes even a fourth.  You expect to
> make the investments and get the brand built and invest
> money to get the brand built so you could make the
> profits that were expected in the fifth, seventh, tenth,
> twentieth, and thirtieth year.  We were still in the
> midst of our growing.

(Tr. at 876).  Thus, Celebrity's track record before the incident was neither sufficiently protracted nor sufficiently typical of the performance of a mature company in the cruise industry to provide strong validation for the yardstick analysis.[5]

---

[5] Essef argues that the fact that Celebrity was a new company not only makes it difficult to validate Mr. Schweihs' yardstick,

Even in the absence of sufficient historical data, Mr. Schweihs' analysis might nonetheless be convincing if the components of his yardstick were similar enough to Celebrity. They were not. Carnival, for example, was a much larger business than Celebrity. In 1995, it had gross revenues of almost $2 billion, as compared to $236 million for Celebrity, and roughly five times the number of berths. (Tr. at 1569; Def. Exh. 408). Accordingly, Carnival benefitted from economies of scale unavailable to Celebrity. (Tr. at 1345-46). It was also more diversified. Not only did it operate cruise ships under more than one brand and in several different markets, but it also operated bus lines, land

---

but also renders any award of lost profits purely conjectural and therefore impermissable. In support of this contention, Essef cites Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000), and Kenford Co. v. County of Erie, 67 N.Y.2d 257, 502 N.Y.S.2d 131 (1986), both of which completely rejected claims for lost profits asserted by new enterprises. Each of those cases, however, is distinguishable. In Schonfeld the court denied lost profits where a proposed cable television venture aborted before it was even launched. As the court noted, the operating entity's profits "were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers." 218 F.3d at 173 (quoting the district court decision at 62 F. Supp. 2d 1062, 1079 (S.D.N.Y. 1999)). Similarly, in Kenford, the court rejected a claim for lost profits allegedly arising from a failed plan to build a new sports stadium. 67 N.Y.2d at 262-63, 502 N.Y.S.2d at 133. Here, by contrast, the jury was not asked to use Celebrity's past performance as the basis for speculating about how it might have profited from an endeavor that never came to fruition. Rather, the task was to determine the extent to which Celebrity's ongoing operations were affected by the Legionnaires' incident. In these circumstances, the absence of a substantial history of past performance does not preclude an award of profits altogether.

tours, and hotels, all of which were included in the financial data used by Mr. Schweihs to construct his yardstick.  (Tr. at 1292-94, 1308-09, 1330-33, 1852-53).  Furthermore, even when the companies competed within the same market segment, they had different itineraries: Celebrity sailed to Bermuda, where it had one of a handful of exclusive docking contracts, and to the Caribbean, while Carnival sailed to the Caribbean, the Panama Canal, the Mediterranean, Mexico, the South Pacific, the Far East, Hawaii, Alaska, and Europe.  (Def. Exhs. 45, 408).  Kenneth Dubbin, RCCL's chief negotiator in the purchase of Celebrity, acknowledged that Celebrity and Carnival were "very different companies."  (Tr. at 1333).  Carnival's inclusion in the composite therefore undermines the legitimacy of the yardstick as a predictor of Celebrity's performance.

The same is true of American Classic Voyages.  While closer in size to Celebrity, its business consisted of operating paddle wheel riverboats on rivers and intracoastal waterways within the United States and operating a cruise ship exclusively in the Hawaii market.  (Def. Exhs. 45, 408).  Mr. Wallack, one of Celebrity's witnesses, acknowledged that he probably would not consider American Classic Voyages comparable to Celebrity.  (Tr. at 241).

Although these flaws do not render Mr. Schweihs' analysis inadmissible, they diminish its value in establishing lost profits.  Accordingly, Essef is entitled to a new trial on the issue of lost

profits.[6]

C. Lost Enterprise Value

Mr. Schweihs calculated lost enterprise value by projecting Celebrity's cash flow in perpetuity, discounting it back to the date of the sale of the company to RCCL, comparing that amount to what RCCL actually paid, and further discounting the difference back to the date of the outbreak.  To the extent that Mr. Schweihs' yardstick does not accurately predict Celebrity's earnings, it misestimates Celebrity's future cash flows just as it provides an inaccurate figure for Celebrity's lost profits between 1994 and 1997.  At a minimum, then, Essef is entitled to a new trial on lost enterprise value.  The question remains whether judgment as a matter of law is warranted.

Mr. Schweihs' analysis is dependent upon his selecting an appropriate figure for the WACC, which he uses to discount future cash flows.  The WACC is the rate of return that a company would need in order to attract investors.  (Tr. at 1431).  It is a "weighted average" because a business is likely to be capitalized on the basis of both equity and debt, which have different costs. According to the treatise co-authored by Mr. Schweihs, the basic formula for calculating WACC is:

WACC = $(k_e \times W_e) + (k_d[1-t] \times W_d)$,

---

[6] In light of this determination, it is not necessary to decide whether Mr. Schweihs' use of EBITDA as his measure of profitability was also so flawed that it would warrant a new trial.

where $k_e$ is the total equity rate, $k_d$ is the average cost of debt, t is the tax rate, $W_e$ is the percent equity in the capital structure, and $W_d$ is the percent debt in the capital structure. Shannon P. Pratt, et al., <u>Valuing a Business: The Analysis & Appraisal of Closely Held Companies</u> (2000) (quoted in Def. Exh. 419).

The cost of equity will depend in part on the volatility or risk of the investment.  The risk factor is generally referred to as the beta (β).  Different industries have different levels of risk and therefore different costs of equity.  At the same time, the relative share of debt and equity in a company's capital structure also comes into play in determining the cost of equity. The greater the percentage of debt, the riskier that company will be as an investment (all other things being equal), and the greater the rate of return will have to be in order to attract investors. The risk associated with a company with a specific capital structure is known as a "levered beta;" the risk associated with a company assumed to have no debt is the "unlevered beta."  This is described in Mr. Schweihs' book:

> Published betas for publicly traded stocks reflect the actual capital structure of each respective company.  As such, they can be referred to as <u>levered</u> <u>betas</u>, betas reflecting the actual financial leverage of the company's capital structure.  If the leverage of the company subject to valuation differs significantly from the leverage of the guideline companies selected for the analysis, it may be desirable to adjust the guideline betas for use in estimating the required rate of return on equity in the context of [the Capital Asset Pricing

26

Model].

> This adjustment is performed by first computing <u>unlevered</u> <u>betas</u> for the guideline companies.  An <u>unlevered</u> <u>beta</u> is the beta the company would have if it had no debt.  The second step is to decide where the subject company's risk would fall on an unlevered basis relative to the guideline companies.  The third and final step is to relever the beta for the subject company on the basis of one or more assumed capital structures.  The result will be a market-derived beta that has been specifically adjusted for the degree of financial leverage of the subject company.

> To summarize, the steps are as follows:

> 1. Compute an unlevered beta for each of the guideline companies.

> 2. Decide where the risk would fall for the subject company relative to the guideline companies assuming all had 100 percent equity capital structures.

> 3.  Relever the beta for the subject company based on one or more assumed capital structures.

<u>Valuing a Business</u> at 167-68 (footnote omitted) (Pl. Exh. 345A). Thus, in order to account for the risk associated with a company's specific capital structure, an analyst can either use the levered beta for the guideline companies (e.g., the industry as a whole) on the assumption that the capital structure of those companies is similar to that of the target company, or he can take the unlevered beta for the guideline companies and relever it in light of the target's specific known capital structure.[7]

---

[7] The formula for computing the relevered beta is:

$$\beta_L = \beta_U (1 + (1 - t)(\overline{W}_d \div \overline{W}_e)),$$

27

Mr. Schweihs did neither.  Although he testified that he used a levered beta taken from a sourcebook for the costs of capital in various industries (Tr. at 1436-39; 1495-96), Essef demonstrated that the figure he adopted was the unlevered beta for the cruise industry.  (Tr. at 1700-03; Def. Exh. 419).  Celebrity acknowledges that Mr. Schweihs misspoke and that he in fact used the unlevered beta.  (Celebrity's Memorandum of Law in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law or, Alternatively, a New Trial ("Pl. Memo.") at 29; Pl. Exh. 344K).

Celebrity contends that Mr. Schweihs was nevertheless entitled to exercise his professional judgment in selecting the WACC.  (Pl. Memo. at 29-32).  On redirect examination, counsel for Celebrity inquired about his calculation of beta:

Q. Just one more question: There was some discussion about beta.  Without going into it deeply, did you arrive at a beta in your report?

A. Yes, for both 1994 and 1997.

Q. And you stand by it?

A. Yes.  I think that's the fairest way to present the -- really, the cost of equity that's used in the weighted average cost of capital, and I considered a variety of ways of doing that.  I think that's the best way to represent it here in this situation, in a lost profits analysis.

(Tr. at 1503).  Celebrity further points out that the portion of

---

where $\beta_U$ is the unlevered beta, $\beta_L$ is the levered beta, t is the tax rate for the company, $W_d$ is the percent debt in the company's capital structure, and $W_e$ is the percent equity in its capital structure.  (Def. Exh. 419).

Mr. Schweihs' book relied on by Essef states that an analyst "may" relever the chosen beta, not that he must.  (Pl. Memo. at 30).

These contentions are unconvincing.  First, Mr. Schweihs' book states that "if the leverage of the company subject to valuation differs significantly from the leverage of the guideline companies, it may be desirable to adjust the guideline betas."  Valuing a Business at 167 (Pl. Exh. 345A).  In other words, the analyst may take the levered beta for an industry and relever it if the capital structure of the target company varies significantly from that of the typical company within the industry.   The book does not suggest that the analyst can simply use the unlevered beta.  Futhermore, while judgment may well play a role in identifying an appropriate WACC, there is no evidence of how Mr. Schweihs exercised any such judgment here.  He did not justify calculating the WACC based on the implicit premise that Celebrity had no debt when, in fact, its capital structure was approximately half debt and half equity.  (Pl. Exh. 344K).  His mere assertion that he stands by his analysis is not sufficient.  Cf. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (court not required to accept ipse dixit of expert).  Viewing the evidence in the light most favorable to Celebrity, there is simply  insufficient evidence to support Mr. Schweihs' opinion, upon which Celebrity relied at trial.  Essef is therefore entitled to judgment as a matter of law on Celebrity's claim for lost enterprise value.

Essef's affirmative proof provides additional support for this conclusion.   Its expert witness, Dr. Frederick C. Dunbar, calculated Celebrity's lost enterprise value utilizing all of Mr. Schweihs' calculations except that Dr. Dunbar introduced a levered beta to account for Celebrity's capital structure. Based on this analysis, he determined that Celebrity's value was not diminished at the time that it was sold to RCCL.  (Tr. at 1688-1712; Def. Exh. 419).  Likewise, the investment firm of Goldman Sachs provided a fairness opinion to OSG when that entity was negotiating to sell its interest in Celebrity, and Goldman Sachs used a range of interest rates that included the WACC as calculated by Dr. Dunbar, while the rate chosen by Mr. Schweihs was well outside the range. (Tr. at 1706-07).

Essef's motion for judgment as a matter of law is therefore granted with respect to Celebrity's claim for lost enterprise value.[8]

D. <u>Misconduct by Counsel</u>

Because a new trial is necessary on lost profits, it is appropriate to address Essef's claim that Celebrity's counsel engaged in misconduct.  According to Essef, Celebrity's attorney

---

[8] In light of this determination, there is no need to address Essef's argument that only Celebrity's prior shareholders, and not Celebrity itself, have standing to seek damages for the claimed diminution in value.  Nor is there a need to consider the contention that Mr. Schweihs' lost enterprise value calculation is suspect because he failed to compare the sale of Celebrity to any other actual transaction.

improperly prejudiced the jury by repeatedly referring during closing argument to the fact that Essef had been found liable for fraud. But there was no impropriety. In the usual case, a jury would have heard all of the evidence of fraudulent conduct. The only reason that it did not do so here was that the case was bifurcated and a prior jury had already determined liability. Essef can hardly complain that the record was not completely sanitized to prevent the jury from learning anything about the underlying claims.

      E. <u>Reliability of the Verdict</u>

Essef also challenges the verdict and seeks a new trial on the grounds that the jury deliberated only briefly and rendered its decision without waiting to review certain evidence it had requested. This argument, too, is without merit. "Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." <u>Wilburn v. Eastman Kodak Co.</u>, 180 F.3d 475, 476 (2d Cir. 1999) (per curiam); <u>see also</u> <u>HSA Residential Mortgage Services of Texas v. State Bank of Long Island</u>, No. 05-CV-3185, 2006 WL 2938826, at *8 (E.D.N.Y. Sept. 28, 2006). Nor is it inappropriate to take a verdict without providing information previously requested by the jury, <u>see United States v. Young</u>, 140 F.3d 453, 456-57 (2d Cir. 1998), particularly where the jury has indicated that it no longer wishes to review that evidence. In this case, the jury

affirmatively indicated that it was prepared to render its verdict without obtaining responses to its prior requests. (Tr. at 2307-08).

F. Comparative Fault

Finally, Essef asks that any judgment against it be reduced by thirty percent to reflect the determination by the jury in the liability phase that Celebrity was thirty percent liable to the passengers who contracted Legionnaires' disease. This application is denied without prejudice to renewal following retrial.

Conclusion

For the reasons set forth above, Essef's motion for judgment as a matter of law is granted with respect to Celebrity's claim for lost enterprise value. Essef's motion for judgment on Celebrity's lost profits claim is denied, but its alternative application for a new trial is granted. The remaining issues are determined as set forth in the body of this opinion.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         January 17, 2007

32

Copies mailed this date:

Gregory O'Neill, Esq.
Mark M. Jaffe, Esq.
Mary T. Reilly, Esq.
Eric M. Underriner, Esq.
Elizabeth McCoy, Esq.
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York  10281

Jeffrey C. Crawford, Esq.
Todd A. Bakal, Esq.
Douglas Eisenstein, Esq.
Renee M. Plessner, Esq.
Kenneth R. Lange, Esq.
Mound Cotton Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004

John S. Martin, Jr., Esq.
Martin & Obermaier
565 Fifth Avenue
New York, NY 10017