- - - - - - - - - - - - - - - :
                :
CELEBRITY CRUISES INC., and  :     96 Civ. 3135 (JCF)
FANTASIA CRUISING INC.,    :
                :
     Plaintiffs,      :      OPINION
                :      AND ORDER
   - against -      :
                :
ESSEF CORP., PAC-FAB, INC.,  :
and STRUCTURAL EUROPE N.V.  :
(f/n/a SFC),         :
                :
     Defendants.      :
- - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

When a number of passengers aboard the cruise ship Horizon contracted Legionnaires' Disease in 1994, they brought suit against Celebrity Cruises Inc. and Fantasia Cruising Inc. (collectively, "Celebrity"), the owners and operators of the vessel, and against Essef Corp., Pac-Fab, Inc., and Structural Europe N.V. (collectively "Essef"), who had designed, manufactured, and distributed the water filter in the whirlpool spa where the disease originated. Thereafter, Celebrity brought the instant action, asserting claims against Essef for the economic damages that it suffered as a result of the outbreak.

This case has been litigated in installments. Having agreed to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), the parties stipulated to determination of all liability issues -- those arising out of Celebrity's claims as well as those

related to the passengers' claims -- in a single bellwether trial. That trial took place in May 2000. The jury returned a verdict in favor of the passenger plaintiffs and against both Celebrity and Essef. The jury also found in favor of Celebrity on its claims against Essef, and a damages trial based on that determination was conducted in the spring of 2006. When the jury in the 2006 damages trial returned a verdict in favor of Celebrity for approximately $190 million, Essef moved for judgment as a matter of law or, in the alternative, for a new trial. I granted that motion in part, awarding judgment to Essef on one category of damage claims and ordering the retrial of another. Celebrity Cruises Inc. v. Essef Corp., 478 F. Supp. 2d 440 (S.D.N.Y. 2007) ("Celebrity IV"). A second trial on damages was held in June 2007, and this time the jury found Essef liable to Celebrity for approximately $15 million in lost profits.

Three issues remain outstanding. First, Essef has moved pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law on Celebrity's lost profits claim. Second, Essef contends that any amount awarded against it should be reduced to reflect the jury's determination in the bellwether trial of Celebrity's comparative liability. Finally, Celebrity seeks an award of prejudgment interest on the amounts ultimately awarded. The facts pertinent to these issues will be discussed in connection

with each legal analysis.[1]

<u>Judgment as a Matter of Law</u>

    A. <u>Background</u>

In the bellwether trial, the jury returned a verdict in favor of the passenger plaintiffs, finding both Essef and Celebrity responsible and assigning seventy percent of the liability to Essef and thirty percent to Celebrity. The jury also determined that Essef was liable to Celebrity for negligence, failure to warn, strict products liability, breach of express and implied warranties, negligent misrepresentation, and fraud.

Celebrity's damage claims were reserved for later determination. Those claims were divided into four categories. Category I included claims for indemnification of attorneys' fees, costs, and amounts paid to the passenger plaintiffs. Category II covered other out-of-pocket losses including refunds to passengers, expenses incurred as a result of the cancellation of cruises, and the costs of decontaminating the Horizon. Category III was comprised of lost profits from the date of the incident to the date

_____

[1] The factual background is also set forth in more detail in prior decisions in this case and in opinions relating to the bellwether case. <u>See</u> <u>Silivanch v. Celebrity Cruises, Inc.</u>, 333 F.3d 355 (2d Cir. 2003); <u>Celebrity IV</u>, 478 F. Supp. 2d 440; <u>Celebrity Cruises Inc. v. Essef Corp.</u>, 434 F. Supp. 2d 169 (S.D.N.Y. 2006)("<u>Celebrity III</u>"); <u>Celebrity Corp. v. Essef Corp.</u>, No. 96 Civ. 3135, 2005 WL 3527142 (S.D.N.Y. Dec. 23, 2005)("<u>Celebrity II</u>"); <u>Celebrity Crusies Inc. v. Essef Corp.</u>, No. 96 Civ. 3135, 2004 WL 2591950 (S.D.N.Y Nov. 15, 2004)("<u>Celebrity I</u>"); <u>Silivanch v. Celebrity Cruises, Inc.</u>, 171 F. Supp. 2d 241 (S.D.N.Y. 2001).

when Celebrity was acquired by Royal Caribbean Cruise Lines ("RCCL") in 1997. And Category IV consisted of the allegedly diminished value of Celebrity at the time it was purchased by RCCL.

The Category I damage claims were settled or otherwise disposed of. At the first damages trial, the jury awarded Category II out-of-pocket damages of $10,435,669, and Essef did not challenge that determination in its post-trial motions. Celebrity IV, 478 F. Supp. 2d at 444. The same jury awarded $47,648,156 in lost profits under Category III, id. at 445, and I denied Essef's motion for judgment as a matter of law with respect to this aspect of the verdict, but granted its alternative application for a new trial. Id. at 449, 452. Finally, the same jury awarded Celebrity $135 million in lost enterprise value, id. at 445, but I granted Essef's post-trial motion for judgment as a matter of law and struck that portion of the verdict. Id. at 454.

At the first damages trial, Celebrity presented evidence of lost profits from a number of sources:

> First, it sought to demonstrate that the company had been stigmatized by the publicity it received as a result of the outbreak. Accordingly, it introduced numerous clippings from the print media as well as examples of broadcast coverage of the incident. Next, several former Celebrity officers and employees testified about the perceived effect of the Legionnaires' outbreak on bookings. They represented that demand had dropped after the incident and that travel agents were wary of booking their clients on Celebrity vessels. Finally, Celebrity's expert witness, [Robert] Schweihs, presented a model that quantified the company's lost profits attributable to the Legionnaires' incident. His analysis was based on the difference between the earnings before interest, taxes,

4

depreciation, and amortization ("EBITDA") that Celebrity could reasonably have anticipated had there been no outbreak and that which it actually realized. For the period from July 1, 1994 to December 31, 1994, he used projections prepared by Celebrity's management as expected EBITDA. For the period from December 31, 1994 until Celebrity was sold in 1997, he estimated expected EBITDA based on a "yardstick" consisting of three other cruise lines: RCCL, Carnival Corp. ("Carnival"), and American Classic Voyages. Mr. Schweihs then calculated the difference between Celebrity's expected EBITDA and its actual EBITDA for each year. Finally, he discounted the stream of lost profits back to the date of the incident. Using this model, he concluded that Celebrity had suffered lost profits of $60.25 million.

Id. at 444 (citation and footnote omitted).

In deciding the post-trial motions, I criticized Celebrity's proof in a number of respects. I noted that Celebrity had presented no direct evidence of lost bookings after 1995 stemming from the Legionnaires' incident. Id. at 448-49. It proffered no survey evidence and failed to identify any potential passengers or travel agents who declined to book a cruise out of fear or loss of confidence in Celebrity. Id. By contrast, Essef presented proof that occupancy levels had been restored by the last quarter of 1994, that the publically-traded co-owner of Celebrity did not mention any economic impact of the outbreak in its board minutes or its regulatory reports after 1994, and that Celebrity informed a major creditor in late 1994 that the brand had not suffered long-term damage. Id. at 449-50. I also found that Mr. Schweihs' analysis was flawed because he had not sufficiently validated the "yardstick" against which he measured Celebrity's profitability.

5

First, I noted that Celebrity did not have an adequate historical record to establish that its performance had paralleled that of the yardstick companies in the past.  Id. at 451.  Second, I observed that Mr. Schweihs had not provided compelling evidence that the yardstick companies he chose were sufficiently similar to Celebrity to warrant including them in the analysis.  In particular, Carnival was a significantly larger, more diverse company that operated cruise itineraries different from Celebrity's, and American Classic Voyages offered unique cruise products in entirely distinct geographic markets.  Id. at 451-52.  On the basis of this analysis, I granted Essef's motion for a new trial.  However, I also determined that "there is not such an absence of evidence supporting the jury's award of lost profits that judgment as a matter of law is warranted."  Id. at 449.

At the second damages trial, Celebrity addressed at least some of my concerns.  It produced anecdotal evidence of travel agents who, because of the Legionnaires' outbreak, did not arrange bookings with Celebrity for some period after 1995.  For example, Richard Sasso, Celebrity's former President, testified that Bob Falcone, an agent in charge of some 230 salespeople, stopped booking with Celebrity after the incident and only resumed in late 1996.  (Tr. at 1722-24).[2]  Similarly, Cyril Hopkins, Celebrity's former Vice President in charge of pricing and revenue management,

---

[2] "Tr." refers to the transcript of the second damages trial.

described how some agents refused to do business with Celebrity immediately after the outbreak. (Tr. at 544-45). Further, he testified that an agent who had previously booked over $1 million worth of business with Celebrity stopped doing so because of the Legionnaires' event and only revived the relationship in 1996 or 1997. (Tr. at 595-98). Likewise, Mr. Hopkins recounted how another agent represented passengers who refused to cruise on the Horizon as late as 2000. (Tr. at 598-99).

At the second damages trial, Celebrity also supplemented its expert evidence. In addition to expounding the yardstick analysis that he presented at the first damages trial, Celebrity's expert witness, Mr. Schweihs, demonstrated how the addition of each component of the yardstick affected the results. He testified that if he utilized RCCL as the only comparator, he would calculate Celebrity's discounted lost profits for the 1994-1997 period to be $57,198,000. Then, if he included Carnival in the yardstick, lost profits would be $57,801,000. Finally, adding American Classic Voyages to restore the yardstick that he had originally adopted yielded a lost profits figure of $60,250,000. (Tr. at 1428-74; Pl. Exhs. 344C, 344H, 483, 484, 485, 486, 487, 494, 495, 496).

On the basis of the evidence presented at the second damages trial, the jury awarded Celebrity a total of $15,155,572 in lost profits. This amount was comprised of losses of $2,640,899 in 1994 and $12,514,673 in 1995. (Tr. at 2257-58). The jury determined

that Celebrity had suffered no lost profits during the years 1996 or 1997 attributable to the Legionnaires' incident. (Tr. at 2258).

## B. Legal Standard

Under Rule 50, judgment as a matter of law is warranted only if "'(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" Advance Pharmaceutical, Inc. v. United States, 391 F.3d 377, 390 (2d Cir. 2004) (quoting Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998) (alterations in original)); accord Schwartz v. Twin City Fire Insurance Co., 492 F. Supp. 2d 308, 317 (S.D.N.Y. 2007). The court must view the evidence in the light most favorable to the party opposing the motion and must defer to the credibility determinations and reasonable inferences of the jury. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000); Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007); Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002). The court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." Meloff v. New York Life Insurance Co., 240 F.3d 138, 145 (2d Cir. 2001) (quoting Galdieri-Ambrosini, 136 F.3d at 289); see also Reeves, 530 U.S. at 150. And, "although the court

8

should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151; accord Zellner, 494 F.3d at 371; Mickle, 297 F.3d at 120.

C. Application

Essef relies in large part on the purported failure of Celebrity to respond the criticisms that I leveled at its proof following the first damages trial. According to Essef:

> Although Celebrity argues that it presented additional exhibits and testimony in the 2007 Trial that purportedly addressed the Court's ruling about Celebrity's failure of proof in the 2006 Trial, the additional evidence Celebrity presents is no more probative than the evidence that the Court has already held was insufficient to link any alleged lost profits to the Incident. Because the same failure of proof still exists in 2007 as the Court held existed in 2006, Essef submits that the Court should grant Essef's motion for judgment as a matter of law.

(Reply Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law at 1). The flaw in this argument is that, while I granted Essef's previous motion for a new trial, I denied its motion for judgment as a matter of law with respect to lost profits. Therefore, if the evidence in the second damages trial was substantially the same as the evidence in the first, the shortcomings that I previously identified in Celebrity's proof would still not suffice to warrant judgment as a matter of law.[3]

_____

[3] Interestingly, following the first damages trial, Essef moved for judgment as a matter of law on Celebrity's lost profits claims for the years 1996 and 1997, but sought only a new trial with respect to the jury's award of lost profits for 1994 and 1995.

In any event, Celebrity did buttress its proof at the second damages trial, as described above. Though hardly overwhelming, it presented some evidence that the stigma caused by the Legionnaires' outbreak motivated some travel agents to shy away from booking their clients on Celebrity well after the incident. More importantly, Mr. Schweihs addressed my doubts about the validity of his yardstick analysis. Essef's expert, Jeffrey Baliban, testified in both damages trials that RCCL, while not a perfect clone, was the yardstick company most comparable to Celebrity. (Tr. at 1835-36, 1867, 1964-69). Indeed, he used RCCL to make his own calculations of what Celebrity might have lost as a consequence of the Legionnaires' outbreak. (Tr. at 1867-81). However, he argued that adding other, less comparable companies to the yardstick had undermined its validity. (Tr. at 1867). At the second damages trial, Mr. Schweihs addressed this contention by testifying that a damages calculation using RCCL alone did not reach a significantly different result from an analysis using RCCL together with Carnival and American Classic Voyages. (Tr. at 1470, 1474). Moreover, the damages awarded by the jury were well below any of the alternative calculations offered by Mr. Schweihs, in part because the jury did not award any lost profits for 1996 or 1997.

To be sure, Essef did not allow the new evidence proffered by Celebrity to go unchallenged. It cast doubt on the

Celebrity IV, 478 F. Supp. 2d at 447.

representativeness and long-term significance of the evidence Celebrity presented concerning stigma. It continued to argue that all of the companies used in the yardstick model were too dissimilar from Celebrity for Mr. Schweihs' analysis to be valid. Finally, it took issue with other aspects of Mr. Schweihs' methodology. However, reviewing the record as a whole, I cannot say that the evidence was so overwhelmingly favorable to Essef that no reasonable jury could have reached the conclusion that this one did. Essef's motion for judgment as a matter of law is therefore denied.

Comparative Fault

    A. Background

    As noted above, the jury in the bellwether trial found both Essef and Celebrity liable for injury to the passenger plaintiffs and allocated seventy percent of the responsibility to Essef and thirty percent to Celebrity. The significance of that finding with respect to Celebrity's claims against Essef soon became a matter of dispute. When Celebrity sought to amend its complaint to specify its damages claims against Essef, Essef opposed the motion, arguing in part that Celebrity was not entitled to indemnification for damage payments made to passengers beyond the seventy percent Essef had already paid and that any out-of-pocket damages proven by Celebrity should likewise be reduced by thirty percent. Celebrity I, 2004 WL 2591950, at *2. Celebrity countered that Essef had

waived its right to a reduction of damages based on comparative fault, because, at the bellwether trial, it had never separately requested an allocation of responsibility with respect to Celebrity's claims against it. Id. I determined that it was unnecessary to resolve the waiver issue at that stage, noting that

> there is no doubt that Celebrity prevailed against Essef on its claim of fraud. The analysis of comparative fault with respect to an intentional tort is not coextensive with that relating to negligence claims, so there is no reason to assume that the jury's allocation with respect to the passengers' claims would apply; indeed, it may be that Essef is precluded altogether from arguing comparative fault as to the fraud claim.

Id. I therefore permitted Celebrity to amend its complaint and reserved these issues for summary judgment or trial. Id. at 2-3.

As the first damages trial approached, the parties did, indeed, cross-move for summary judgment, and Celebrity renewed its argument that "it is entitled to full indemnification from Essef because Essef failed at the bellwether trial to seek the jury's determination of Celebrity's comparative fault." Celebrity II, 2005 WL 3527142, at *3. However, I found that "the judgment entered in the bellwether case refers to findings of liability against Essef on Celebrity's tort claims but says nothing about indemnification." Id. at *4. I concluded that "[t]he relevant waiver, then, was not Essef's, but Celebrity's for failing to pursue its indemnification claims at the bellwether trial. Id. at *5. Accordingly, I denied Celebrity's motion for summary judgment.

Celebrity now argues, as it did on summary judgment in

connection with its indemnification claim, that Essef has waived
its right to a reduction of damages by failing to seek a finding of
comparative fault from the jury at the bellwether trial. Further,
Celebrity contends that comparative negligence cannot be raised as
a defense to fraud, and because it prevailed on its fraud claim
against Essef, there can be no reduction of damages. In the
context of this case, neither argument is persuasive.

B. <u>Analysis</u>

1. <u>Waiver</u>

At the bellwether trial, the jury was asked to allocate
responsibility for the Legionnaires' outbreak and it did so by
attributing seventy percent of the fault to Essef and thirty
percent to Celebrity. Because the injuries for which Celebrity
seeks compensation from Essef flow exclusively from that outbreak,
the allocation of responsibility must be the same. There was
therefore no need to request from the bellwether jury a separate
verdict for comparative fault specifically with respect to
Celebrity's claims against Essef. Indeed, had the jury been asked
to do so, and had it found Celebrity's comparative negligence to be
less than thirty percent with respect to its claims against Essef,
that verdict would have been rejected as inconsistent with the
jury's allocation of liability for the passenger plaintiffs'
claims. See <u>Crockett v. Long Island Railroad</u>, 65 F.3d 274, 278 (2d
Cir. 1995) (holding that irreconcilably inconsistent verdicts

cannot stand).

There is one respect in which the assignment of fault for injury to Celebrity might theoretically have deviated from the allocation of responsibility for injury to the passengers. Celebrity could have engaged in conduct after the outbreak that exacerbated its own damages. For example, it might have failed to take reasonable public relations steps to ameliorate the stigma. However, proof of such conduct could only have reduced the proportion of Essef's responsibility, not increased it. Thus, the bellwether jury's thirty percent allocation of responsibility to Celebrity with respect to the passenger claims acts as a ceiling for Essef's liability and, correspondingly, as a floor for the amount by which Essef's damages must be reduced. Therefore, Essef's failure to seek a more explicit verdict did not prejudice Celebrity.

The two collateral arguments that Celebrity offers in favor of its waiver theory do not undermine this reasoning. First, Celebrity contends that because the jury allocated responsibility on its claims against Essef among the three Essef entities, the absence of any such allocation of fault to Celebrity implies that none was intended. (Celebrity's Memorandum of Law in Opposition to Essef's Motion for Judgment as a Matter of Law and in Response to Essef's other Post-Trial Motions ("Celebrity Memo.") at 9-10). Yet, no additional allocation was necessary because, once the jury

determined that Essef was seventy percent liable, whether to the passengers or to Essef, the only remaining step was to determine how that responsibility should be divided among the Essef entities.

Second, Celebrity points out that in a legal malpractice action brought by Essef against its former counsel, Squire, Sanders and Dempsey LLP, Essef has argued that it was injured by the firm's failure to seek a jury determination of comparative fault with respect to Celebrity's claims against Essef. This, according to Celebrity, estops Essef from contending that it did not waive the right to avail itself of principles of comparative negligence. (Celebrity Memo. at 10). But nothing prevents Essef from pleading in the alternative by, as in this instance, asserting a contingent or hypothetical claim: if Essef is found to have waived comparative negligence, only then does it have a malpractice claim arising out of that failure. See Lawser v. Poudre School District R-1, 171 F. Supp. 2d 1150, 1158 (D. Colo. 2001) (finding that contingent claim is permissible hypothetical pleading). The predicate pled for that contingent claim, however, does not operate as a binding admission. See Henry v. Daytop Village, Inc., 42 F.3d 89, 95-96 (2d Cir. 1994); Ascher v. Target Corp., No. 05-CV-4826, 2007 WL 3287441, at *5 (E.D.N.Y. Oct. 15, 2007).

### 2. Comparative Negligence as a Defense to Fraud

There is some support for the proposition advanced by Celebrity that comparative negligence may not generally be raised

as a defense to fraud.  Compare Blue Cross and Blue Shield of New
Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 575
(E.D.N.Y. 1999) ("Contributory or comparative negligence is not a
defense to fraud.") and City of New York v. Corwen, 164 A.D.2d 212,
218, 565 N.Y.S.2d 457, 460 (1st Dep't 1990) ("In the past,
contributory negligence clearly has not been regarded as a defense
to intentional torts and that appears to remain the rule with
respect to comparative negligence.") (citations omitted) with Bank
Brussels Lambert v. Chase Manhattan Bank, N.A., No. 93 Civ. 5298,
1999 WL 710778, at *2 (S.D.N.Y. Sept. 10, 1999) ("There is no
logical reason why, where an intentional tort on the part of the
defendant is shown to be only a partial cause of a plaintiff's
loss, the plaintiff should nevertheless also recover a further part
of its loss shown to have been caused by its own negligence.").
However, the cases that so hold involve circumstances where
comparative negligence is asserted as a direct defense: the
defendant is contending that even if he defrauded the plaintiff,
the plaintiff was partially responsible for his own injury, for
example, as a consequence of failing to put in place sufficient
anti-fraud measures.  See, e.g., Long Island Savings Bank, FSB v.
Bigman, No. CV 89-0927, 1991 WL 144224, at *6-7 (E.D.N.Y. June 25,
1991) (finding that plaintiff's possible negligence in failing to
detect defendant's fraud could not be asserted as defense); see
also Corwen, 164 A.D.2d at 216-18, 565 N.Y.S.2d at 459-60

16

(defendants accused of bribery not permitted to argue plaintiff's negligent hiring and supervision of agent who extorted defendants as defense).  Under these circumstances, courts are understandably reluctant to "blame the victim" by reducing the compensation to the defrauded party.

By contrast, in this case, the bellwether jury found Essef and Celebrity both responsible for the outbreak and for injury to the passenger plaintiffs.  It was the outbreak, in turn, that caused stigma and ultimately economic injury to Celebrity.  At this stage, Essef is not seeking to diminish its responsibility because of any negligence on Celebrity's part in failing to detect Essef's fraudulent conduct.  Rather, Essef is contending that it should not be held liable for that portion of Celebrity's damages which flow from Celebrity's independent negligence in causing injury to the passengers, which in turn led to economic losses for Celebrity. Celebrity has not identified any case where a court has declined to adjust damages for comparative negligence in circumstances such as these.  Celebrity's damages shall therefore be reduced by thirty percent to reflect its proportionate share of liability for the Legionnaires' incident.

Prejudgment Interest

_____A. Interest Rate

This case arose under the admiralty jurisdiction of the Court. Therefore, even though New York state law determined the

17

substantive rights of the parties, federal law governs the award of prejudgment interest. _Ennar Latex, Inc. v. Atlantic Mutual Insurance Co._, No. 94 Civ. 150, 1995 WL 373444, at *1 (S.D.N.Y. June 21, 1995) (citing _Middle East Engineering & Development Co. v. Arkwright-Boston Manufacturers Mutual Insurance Co._, 675 F. Supp. 855, 856 (S.D.N.Y. 1987)); _see also_ _Hygrade Operators, Inc. v. Clifford_, No. 96 Civ. 174928, 2000 WL 174928, at *5 (S.D.N.Y. Feb. 15, 2000). And, in admiralty actions, prejudgment interest should be awarded absent exceptional circumstances. _See_ _Ingersoll Milling Machine Co. v. M/V Bodena_, 829 F.2d 293, 310 (2d Cir. 1987); _Ennar Latex, Inc._, 1995 WL 373444, at *1. No such circumstances preclude an award of interest here.

The rate of interest to be applied lies in the discretion of the district court. _See_ _Ingersoll_, 829 F.2d at 311; _Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC_, No. 04 Civ. 9651, 2007 WL 3125318, at *7 (S.D.N.Y. Oct. 23, 2007). The court should exercise that discretion with the goal of making the plaintiff whole. _See_ _OT Africa Line, Ltd. v. First Class Shipping Corp._, 124 F. Supp. 2d 817, 823 (S.D.N.Y. 2000); _National Shipping Co. of Saudi Arabia v. Diversified Freight Logistics, Inc._, No. 02 Civ. 100, 2003 WL 22990096, at *10 (S.D.N.Y. Dec. 19, 2003).

Celebrity contends that it should be awarded interest at the average prime rate, compounded annually, or, at a minimum, at the statutory rate under New York law, nine percent. _See_ N.Y. C.P.L.R.

§ 5004.  Neither position is justified.  While New York's statutory rate has the virtue of simplicity, it is ultimately arbitrary and not related to the losses actually suffered by Celebrity.  Although I have noted, in connection with the passenger plaintiffs' claims, that "an ongoing business might be able to demonstrate that it could safely assume a rate of return approaching nine percent," Silivanch v. Celebrity Cruises, Inc., No. 95 Civ. 0374, 2000 WL 1211578, at *2 (S.D.N.Y. Aug. 25, 2000), Celebrity has not pointed to any evidence suggesting that it could have expected to be so profitable as to warrant utilization of either the New York statutory rate or the prime rate.

In general, "[a] plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations."  Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration", 137 F.3d 94, 104 (2d Cir. 1998) (quoting Ingersoll, 829 F.2d at 311); see New York Marine & General Insurance Co. v. Tradeline, 266 F.3d 112, 131 (2d Cir. 2001).  Accordingly, courts in admiralty cases commonly award interest at the average rate paid on six-month United States Treasury Bills.  See Zerega Avenue Realty, 2007 WL 3125318, at *7; National Shipping Co. of Saudi Arabia, 2003 WL 22990096, at *10; OT Africa Line, 124 F. Supp. 2d at 823-24; Zim Israel Navigation Co. v. 3D Imports, Inc., 29 F. Supp. 2d 186, 193-94 (S.D.N.Y. 1998).  The same result is appropriate here: interest shall accrue at the

average six-month Treasury Bill rate, compounded annually.

B. <u>Tolling</u>

Finally, Essef argues that exceptional circumstances warrant tolling the period for prejudgment interest. The files of Celebrity's counsel were destroyed in the September 11, 2001 terrorist attack on the World Trade Center. Accordingly, on January 25, 2002, I issued an order which, among other things, placed Celebrity's damage claim on the Court's suspense calendar until the files could be reconstituted. Subsequently, on July 17, 2003, following the Second Circuit's decision dismissing the appeal of the bellwether case, I issued an order restoring Celebrity's damage claim to the active calendar and requiring fact discovery to be completed within six months of the issuance of a mandate by the Second Circuit. The mandate was not issued until February 10, 2004. In light of the resulting delay in entry of judgment, Essef contends that the accrual of prejudgment interest should be tolled for the period between January 25, 2002 and either July 17, 2003 or February 10, 2004.

In order to justify tolling the accrual of interest, however, it is not enough that the circumstances are exceptional; it must also be equitable to impose the economic burden on the prevailing party. For example, if a plaintiff is responsible for delaying final resolution of a case, tolling the accrual of interest on the damage award won by that plaintiff may be fair. That is not the

case here. Essef attributes the delay in obtaining a final verdict to two factors: the terrorist attack of 9/11 and the Second Circuit's delay in issuing a mandate. Celebrity, of course, was responsible for neither. In circumstances such as this, the risk of additional interest that accompanies a lapse of time should be borne by the party found liable rather than by the party wronged. Therefore, tolling the accrual of interest is not warranted.

Conclusion

For the reasons set forth above, Essef's motion for judgment as a matter of law is denied, the damages awarded to Celebrity shall be reduced by thirty percent to reflect its comparative fault, and interest shall be awarded at the average six-month Treasury Bill rate, compounded annually. Unless the parties agree on a form of judgment, Celebrity shall submit a proposed judgment within ten days of the date of this order, and Essef shall submit any counterproposal within five days thereafter.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           January 4, 2008

21

Copies mailed this date:

Gregory O'Neill, Esq.
Mark M. Jaffe, Esq.
Elizabeth A. McCoy, Esq.
Mary T. Reilly, Esq.
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York  10281

Jeffrey C. Crawford, Esq.
Todd A. Bakal, Esq.
Douglas Eisenstein, Esq.
Renee M. Plessner, Esq.
Kenneth R. Lange, Esq.
Mound Cotton Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004

John S. Martin, Jr., Esq.
Martin & Obermaier
565 Fifth Avenue
New York, NY 10017